232 F.3d 49 (2nd Cir. 2000)
 GABRIEL DiRIENZO; ALAN BILGORE; PAUL BLANCHARD; ROBERT GANS, IRA; ROBERT GANS; A. CARL HELWIG; BARRY ZEMEL; GREGORY N. MAPPUS; HERB SUDZIN; VINCENT DITRANO; BRUCE E. TOLL, IRA; BRUCE E. TOLL; JANE LANZO; INTERNET CAPITAL INC.; DEBORAH MIECZKOWSKI; JOSEPH H. MISIEWICZ; COLIN LOW; HAZEL M. O'BRIEN; DOUGLAS SCHMIDT; CHARLES K. FASOLD; RICHARD GREVE; GRACE SHUM; RONALD GLOTZER; RICHARD HERSHEY; RONALD McELROY; CHARLES MILLER; DEBORAH S. GREVE; ROBERT W. HILLGER; CAROL F. BRINK REVOCABLE TRUST; WILLIAM R. BRINK, IRA; WILLIAM R. BRINK REVOCABLE TRUST; WALTER CHOMPSKI; BRADWAL INVESTMENTS LTD.; LOCAL 138, 138A & 138B INTERNATIONAL UNION OF OPERATING ENGINEERS FRINGE BENEFIT FUNDS; MELVYN B. FLIEGAL; JAMES COLLINS; ALBERT SOLKOV; MICHAEL AND SOPHIA ISAACS; LEE PITMAN; KENNETH HARE; THOMAS LETH; LEVI SABOL; and LAWRENCE M. SIEGEL; on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
PHILIP SERVICES CORPORATION; ALLEN FRACASSI; PHILIP FRACASSI; MARVIN BOUGHTON; ROBERT WAXMAN; JOHN WOODCRAFT; COLIN H. SOULE; NORMAN FOSTER; FELIX PARDO; HOWARD L. BECK; RAY CAIRNS; WILLIAM E.
 HAYNES; ROBERT L. KNAUSS; DERRICK ROLFE; HERMAN TURKSTRA; SALOMON BROTHERS, INC.; MERRILL LYNCH, PIERCE FENNER & SMITH INCORPORATED; BT ALEX. BROWN INCORPORATED; MORGAN STANLEY & CO., INCORPORATED; CIBC OPPENHEIMER CORP.; CREDIT SUISSE FIRST BOSTON CORPORATION; DONALDSON, LUFKIN & JENRETTE SECURITIES CORPORATION; LEHMAN BROTHERS INC.; SCHRODER & CO., INC.; SMITH BARNEY INC.; FURMAN SELZ LLC; ARNHOLD AND S. BLEICHROEDER, INC.; BLACKFORD SECURITIES CORP.; FIRST ALBANY CORPORATION; McDONALD & COMPANY SECURITIES, INC.; JANNEY MONTGOMERY SCOTT INC.; WM SMITH SECURITIES, INCORPORATED; DELOITTE & TOUCHE, CHARTERED ACCOUNTANTS, Defendants-Appellees.
In Re PHILIP SERVICES CORP. SECURITIES LITIGATION THIS DOCUMENT CONCERNS:
NOAH LIFF, as former shareholder of Steiner-Liff Iron and Metal Company, Shredders, Inc., McKinley Iron, Inc. and Southern Alloys & Metal Corp., ADAM LIFF, as former shareholder of Steiner-Liff Iron and Metal Company, Southern Alloys & Metal Corp. and Southeastern Scrap Trading, Inc., DANIEL LIFF, as former shareholder of Steiner-Liff Iron and Metal Company and Southeastern Scrap Trading, Inc., DARREN LIFF, as former shareholder of Southeastern Scrap Trading, Inc., JAN LIFF, as former shareholder of Steiner-Liff Iron and Metal Company, TERENCE LIFF, as former shareholder of Southeastern Scrap Trading, Inc., ZACHARY LIFF, as former shareholder of Southeastern Scrap Trading, Inc., ROBERT H. WILSON, as former shareholder of Shredders, Inc. and Southeastern Scrap Trading, Inc., HERMAN GELLMAN, as former shareholder of McKinley Iron, Inc., ROBERT GELLMAN, as former shareholder of McKinley Iron, Inc., DANIEL SHAPIRO, as former shareholder of McKinley Iron, Inc., LEONARD BIERMAN, as former shareholder of McKinley Iron, Inc., ALBERT BAISLEY, as former shareholder of Southern Alloys & Metal Corp. and ELIZABETH BAISLEY, as former shareholder of Southern Alloys & Metals Corp., Plaintiffs-Appellants,
v.
PETER CHODOS, ALLEN FRACASSI, COLIN SOULE, HOWARD BECK and MARVIN D. BOUGHTON, Defendants-Appellees.
 Docket No. 99-7825, No. 99-7776
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: March 13, 2000
Decided: November 08, 2000
 
 Plaintiffs in a direct action and an as-yet uncertified class action brought suit against the directors and officers of a Canadian corporation now in bankruptcy proceedings and other defendants, alleging federal securities fraud and related state law claims. The United States District Court for the Southern District of New York (Mukasey, J.), dismissed both cases on the ground of forum non conveniens. Plaintiffs-appellants argue that the district court abused its discretion in failing to accord full deference to plaintiffs' choice of forum, in mischaracterizing transactions as international, and in giving too little weight to U.S. interest in enforcing its securities laws.
 Reversed and remanded.[Copyrighted Material Omitted]
 NEIL L. SELINGER, White Plains, New York (Jeanne F. D'Esposito, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, New York; Jeffrey C. Block, Michael T. Matraia, Berman, DeValerio & Pease LLP, Boston, Massachusetts, of counsel), for Plaintiffs-Appellants DiRienzo, et al.
 JACK M. WEISS, New York, New York (John T. Behrendt, Marshall R. King, Gibson, Dunn & Crutcher LLP, New York, New York, of counsel), for Defendant-Appellee Deloitte & Touche.
 GERALD A. NOVACK, New York, New York (David S. Versfelt, Kirkpatrick & Lockhart LLP, New York, New York; Stuart I. Shapiro, Michael I. Allen, Shapiro Forman & Allen LLP, New York, New York; Frederick P. Schaffer, Schulte Roth & Zabel LLP, New York, New York; Charles W. Schwartz, Vinson & Elkins LLP, Houston, Texas; Craig R. Smyser, Smyser Kaplan & Veselka LLP, Houston, Texas, of counsel), for Defendants- Appellees Director-Officers.
 Brad S. Karp, New York, New York (Michael E. Gertzman, Amy B. Vernick, Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, of counsel), filed a brief for Defendants-Appellees Underwriter Defendants.
 Allan A. Capute, Washington, D.C. (Harvey J. Goldschmid, David M. Becker, Eric Summergrad, Securities and Exchange Commission, Washington, D.C., of counsel), filed a brief for the Securities and Exchange Commission, Amicus Curiae, in support of Appellants.
 PAUL A. ALEXIS, Nashville, Tennessee (Boult, Cummings, Conners & Berry, PLC, Nashville, Tennessee, of counsel), for Plaintiffs-Appellants Liff, et al.
 GERALD A. NOVACK, New York, New York (David S. Versfelt, Kirkpatrick & Lockhart LLP, New York, New York; Stuart L. Shapiro, Michael I. Allen, Shapiro Forman & Allen LLP, New York, New York, of counsel), for Defendants-Appellees Chodos, Fracassi, Soule, Boughton and Beck.
 Before: CARDAMONE, CABRANES, Circuit Judges, and TRAGER*, District Judge.
 Judge Cabranes dissents in a separate opinion.
 CARDAMONE, Circuit Judge:
 
 
 1
 Philip Services Corporation (Philip), a Canadian metal processing company, is alleged in the complaint in the instant action to have perpetrated a massive fraud upon its shareholders, the vast majority of whom are U.S. investors. Philip decided about eight years ago to become a dominant player in the metal recovery and processing industry in the United States. To that end during the period 1992-97 it purchased 15 American companies and maintained facilities in 12 states. Its American efforts thereafter generated 70 percent of its corporate revenue. To raise money to carry out its corporate plans it sold stock in the U.S. and Canada. In November 1997 it placed two secondary stock offerings that raised $380 million, of which $284 million came from U.S. investors and $94 million came from Canadian investors.[1]
 
 
 2
 By the end of 1996, the number of Philip's shares outstanding, traded on American and Canadian stock exchanges, had increased substantially, and 60 percent of the 70 million shares were held by U.S. investors. To tout its 1997 stock offerings Philip aggressively promoted the stock, traveling to U.S. cities with "road shows," issuing press releases, and filing financial reports with the Securities and Exchange Commission. When extensive litigation was commenced in different states in the U.S. and in Canada, the American suits were all transferred by the Judicial Panel on Multi-District Litigation to the United States District Court for the Southern District of New York, where they were dismissed, prompting the two appeals, argued together, before us now.
 
 
 3
 These appeals arise out of the allegedly fraudulent misrepresentations regarding the income and value of Philip during a three-year period between 1995 and 1998. In both cases plaintiffs allege federal securities law fraud as well as various state law claims. Philip is now in bankruptcy proceedings in Canada. The plaintiffs in DiRienzo, the first appeal, sue as representatives of an as-yet uncertified class of Philip investors who bought stock during the proposed class period. Most Philip shares traded during that period were sold in the United States. The DiRienzo defendants include Philip directors and officers, Philip's accountants Deloitte & Touche, LLP, a member of Deloitte Touche Tohmatsu, a federation of affiliated accountants headquartered in New York City, and the American underwriters of the 1997 public offering.
 
 
 4
 The Liff plaintiffs, in the second appeal, sold their interests in five American corporations for Philip stock and cash, and sue certain Philip directors and officers for alleged fraud in connection with the sales. Both cases were dismissed by the district court under the doctrine of forum non conveniens. See In re Philip Servs. Corp. Sec. Litig., 49 F. Supp. 2d 629 (S.D.N.Y. 1999). Because we think the district court's application of the test established in Gulf Oil Corp. v. Gilbert, 330 U.S. 485 (1947), was in some respects fundamentally flawed, we reverse.
 
 BACKGROUND
 
 5
 Philip, the corporation whose securities lie at the core of this case, has its principal offices in Hamilton, Ontario, Canada, with subsidiaries in the United States. During the proposed class period, its primary base of operations was in the United States, where the bulk of its revenues were generated. Its stock was traded on the New York Stock Exchange (NYSE), the Toronto Stock Exchange (TSE), the Montreal Stock Exchange, and NASDAQ until April 30, 1996. Nearly 80 percent of the shares traded in Philip's stock during the class period traded on U.S. exchanges.
 
 
 6
 After reporting substantial increases in earnings for the years 1995-1997, the company announced on January 26, 1998 that it would take "charges to earnings" for the 1997 fiscal year of between $250 and $275 million. The company attributed 60 percent of the charges to a restructuring and acquisition program and to an overvaluation of goodwill. Two months later Philip announced that the 1997 charges to earnings were actually $310 million, based in part on a $125 million overstatement of inventory. Additional company disclosures made in the following weeks included a further charge to 1997 income of $35 million arising from the improper recording of a copper-related transaction. All these charges against 1997 income totaled $381.2 million.
 
 
 7
 As a result, top officers resigned or were demoted. In addition, Philip has since restated its 1995 and 1996 financial statements to reduce 1995 earnings by $22.5 million and 1996 earnings by $48.4 million. Thus, instead of posting a $28.4 million profit in 1996 as initially reported, it reported a $20 million loss. Philip's share price plummeted from $13 1/8 on January 26, 1998 to $2 9/16 in July 1998, and since August 18, 1998 it has traded below $2 per share.
 
 A. DiRienzo Suit
 
 8
 The DiRienzo complaint alleges four wrongful schemes as bases for its claims. First, the "metals recovery division fraud" entailed a variety of alleged accounting irregularities in the Hamilton, Ontario-based Metals Recovery Group, then headed by Robert Waxman. The alleged irregularities included failure to record transactions, overstatement of inventories, and improper deferral of losses. According to the complaint, the accounting discrepancies were resolved by Philip's taking a Canadian $192.67 million (about U.S. $134 million) charge to income, ascribed by the company to copper trading losses in January 1998, while, in fact, the losses were primarily due to an overstatement of inventory.
 
 
 9
 Second, the "industrial services group fraud" involved two alleged misrepresentations associated with the 1996 acquisition of the Petrochem S.C. facility in South Carolina. First, Philip allegedly improperly capitalized $8 million in 1996 losses rather than taking the losses as current expenses; second, the company allegedly assumed, but failed to record, $15 million in environmental remediation liability when it acquired the facility.
 
 
 10
 Third, the "fraudulent 1997 third quarter results," announced November 5, 1997, allegedly included some $24.2 million in fictitious earnings meant to bolster Philip's sale price for the November 1997 offering that closed on November 12, 1997. Fourth, "Waxman's fraud," for which Philip filed suit against Waxman in Ontario, centered around Waxman's alleged orchestration of transactions that diverted Philip's assets to himself and others between 1995 and 1997, resulting in a $90 million overstatement of the Metals Recovery Group's financial position.
 
 
 11
 During this period, Philip also engaged in various transactions involving its own stock. Between the fall of 1996 and the fall of 1997, it acquired 18 companies, 15 of them American companies, in stock-for-stock deals. On July 30, 1997 it acquired Serv-Tech, Inc. in exchange for 2.7 million shares of Philip common stock. On July 31, 1997 it acquired Allwaste, Inc., in exchange for 23 million shares of Philip common stock. In October 1997 Philip acquired five American corporations for a combination of cash and Philip stock in the transactions underlying the Liff suit.
 
 
 12
 In November 1997 Philip completed secondary public offerings of its stock in the U.S. and in Canada, raising from American and Canadian investors about $380 million. As detailed elsewhere, plaintiffs contend that the documentation underlying all these transactions was fraudulent.
 
 
 13
 The proposed class period in DiRienzo would extend from February 28, 1996 through and including May 7, 1998. The class would include all purchasers of common stock and call options during that period. The complaint also proposes three subclasses: (a) all purchasers of Philip common stock issued in its November, 1997 public offering pursuant to Philip's November 6, 1997 SEC registration statement; (b) those whose shares of Allwaste, Inc. were exchanged for Philip common stock pursuant to a June 24, 1997 registration statement; and (c) those whose shares of Serv-Tech, Inc. were exchanged for Philip common stock pursuant to a June 24, 1997 registration statement.
 
 
 14
 There are three groups of defendants in DiRienzo: the director-officer defendants, Deloitte & Touche, LLP (Deloitte), and the American underwriter defendants.
 
 
 15
 The 14 director-officer defendants include ten Canadians resident in Ontario, among whom Robert Waxman, then president of the Metals Recovery Group and a director, is also a defendant in the Ontario suit brought by Philip, and four Americans, one of whom, Robert L. Knauss, has been since May 1998 chairman of the board of Philip. Another defendant, Norman Foster, served briefly as president of Philip's By-Products Recovery Group. The director and officer defendants generally signed the allegedly false and misleading statements that were part of the public stock offering. Not all of them appear in all the counts in the complaint, but the various claims against some or all of them arise under §11 (false registration statements), §12(a)(2) (false prospectuses or oral communications), and §15 (liability of controlling persons) of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), 77o; §§10(b) (manipulative and deceptive devices) and 20(a) (liability of controlling persons and those who aid and abet violations) of the Securities Exchange Act, 15 U.S.C. §§78j(b), 78t; and Rule 10b-5, 17 C.F.R. §240.10b-5 (manipulative and deceptive devices).
 
 
 16
 Defendant Deloitte is a Hamilton, Ontario partnership comprised solely of Canadian partners. As Philip's outside auditor, Deloitte allegedly rendered unqualified opinions on Philip's 1995, 1996, and 1997 financial statements as well as the financial statements underlying the November 1997 public offering, Allwaste, and Serv-Tech registration statements. The causes of action against Deloitte are also based in federal securities law, specifically Securities Act §11, Securities Exchange Act §10(b), and Rule 10b-5. The complaint alleges that Deloitte and the director-officer defendants are liable as direct participants, as participants in a common scheme to defraud, and as co-conspirators in the alleged wrong.
 
 
 17
 The underwriter defendants are American brokerage and investment banking firms that underwrote the November 1997 American offering. They received commissions for buying large blocks of stock from Philip and then selling the shares to the plaintiffs. The DiRienzo complaint seeks either rescission or damages from the defendants under Securities Act §12(a)(2). Canadian firms underwrote the Canadian offering and are not defendants in this litigation.
 
 
 18
 On June 25, 1999 Philip filed for bankruptcy in both Ontario and, through a subsidiary, in Delaware. Accordingly, all actions against it have been automatically stayed. Philip's current directors and officers therefore are third-party witnesses. Philip has also been sued in Menegon v. Philip Services Corp., No. 4166 CP/98 (Ont. Ct. (Gen. Div.) filed May 5, 1998), a Canadian class action brought in Ontario Superior Court on behalf of Canadian residents who purchased Philip shares between February 28, 1996 and April 23, 1998. The Menegon defendants include Deloitte and the Canadian underwriters of the November 1997 public offering.
 
 B. Liff Suit
 
 19
 The plaintiffs in Liff are 14 American individuals, residents of Tennessee, Alabama, and Missouri, who owned stock in five American corporations that Philip purchased in October 1997. They sue Peter Chodos, Philip's former Executive Vice-President, Corporate Development, and four of the director-officer defendants, all five of whom are residents of Ontario. Neither Waxman, Deloitte, nor the underwriter defendants are named as defendants in Liff. The Judicial Panel on Multi-District Litigation transferred Liff from the Middle District of Tennessee to the Southern District of New York for coordinated pre-trial proceedings. The Liff complaint is in two counts: common law negligent misrepresentation and securities fraud under federal law, Securities Exchange Act §10(b) and Rule 10b-5, and Tennessee law, Tenn. Code Ann. §48-2-121.
 
 C. District Court Proceedings
 
 20
 The DiRienzo plaintiffs appeal from the orders entered on May 18, 1999 and June 19, 1999 in the United States District Court for the Southern District of New York (Mukasey, J.), dismissing their claims on the grounds of forum non conveniens and denying plaintiffs' motion for reconsideration. The Liff plaintiffs appeal from an order entered June 1, 1999 in the same court, dismissing their claims on the same grounds for the reasons given in the order entered in DiRienzo on May 18, 1999.
 
 DISCUSSION
 I Forum Non Conveniens
 A. In General
 
 21
 A federal court's inherent power to decline to entertain a case over which it has jurisdiction is embodied in the doctrine of forum non conveniens. The doctrine serves the ends of justice and the convenience of the parties and their witnesses. See Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1227 (2d Cir. 1996). The modern doctrine was established by the Supreme Court in Gilbert and its companion case Koster v. Lumbermens Mutual Casualty Co., 330 U.S. 518 (1947). Both cases involved dismissal in one federal court in favor of an alternative American forum. Congress' subsequent enactment of 28 U.S.C. §1404(a) (substantially adopting the Supreme Court's rationale in its adoption of the doctrine), which authorizes transfers between federal courts, relegated common law forum non conveniens to cases where the alternative forum to which a transfer is proposed is a foreign one. See Schertenleib v. Traum, 589 F.2d 1156, 1161 (2d Cir. 1978). In these cases we continue to apply the Gilbert test, as elaborated in Koster, Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981), and our own precedents.
 
 
 22
 To prevail on a forum non conveniens motion to dismiss, the defendant must show as a threshold matter that an adequate alternative forum exists. See Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir. 1996). A defendant must next demonstrate that the ordinarily strong presumption favoring the plaintiff's chosen forum is countered by the private and public interest factors set out in Gilbert, which weigh so heavily in favor of the foreign forum that they overcome the presumption for plaintiffs' choice of forum. Gilbert directs that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed," 330 U.S. at 508; accord R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 167 (2d Cir. 1991); see also Alfadda v. Fenn, 159 F.3d 41, 46 (2d Cir. 1998). The burden of proof to demonstrate that the forum is not convenient is on defendant seeking dismissal. See PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 74 (2d Cir. 1998). Because much of the doctrine's strength derives from its flexibility and each case turns on its own facts, a single factor is rarely dispositive. See Piper Aircraft, 454 U.S. at 249-50.
 
 B. Standard of Review
 
 23
 In dismissing a case on the basis of forum non conveniens, a district court enjoys wide discretionary latitude to which we give substantial deference. See id. at 257. Nonetheless, even recognizing that review in an appellate court is limited by the trial court's broad discretion, the power to review would be authority without purpose were it not a meaningful one. See Irish Nat'l Ins. Co. v. Aer Lingus Teoranta, 739 F.2d 90, 92 (2d Cir. 1984). Certainly the reviewing power must encompass the right to determine whether the district court came to an erroneous legal conclusion or a clearly erroneous factual conclusion, see R. Maganlal, 942 F.2d at 167; see also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) (reviewing Rule 11 sanctions), whether it considered all the relevant factors, and whether its balancing of those factors was reasonable, see Piper Aircraft, 454 U.S. at 257.
 
 II Adequacy of the Alternative Forum
 
 24
 As just observed, the threshold question in the forum non conveniens inquiry is whether an adequate alternative forum exists. The alternate forum will normally be adequate so long as the defendant is amenable to process there. See id. at 254 & n.22; Alfadda, 159 F.3d at 45. An agreement by the defendant to submit to the jurisdiction of the foreign forum can generally satisfy this requirement. See, e.g., PT United, 138 F.3d at 74-75; R. Maganlal, 942 F.2d at 167.
 
 
 25
 On rare occasions, however, the remedy available in the alternative forum may be so unsatisfactory that the forum is inadequate. The mere fact that the foreign and home fora have different laws does not ordinarily make the foreign forum inadequate. To the contrary, "dismissal may not be barred solely because of the possibility of an unfavorable change in law." Piper Aircraft, 454 U.S. at 249; accord Alfadda v. Fenn, 159 F.3d at 45 ("That the law of the foreign forum differs from American law should ordinarily not be given conclusive or even substantial weight in assessing the adequacy of the forum.").
 
 
 26
 Even if particular causes of action or certain desirable remedies are not available in the foreign forum, that forum will usually be adequate so long as it permits litigation of the subject matter of the dispute, provides adequate procedural safeguards and the remedy available in the alternative forum is not so inadequate as to amount to no remedy at all. See Piper Aircraft, 454 U.S. at 254-55 & n.22; PT United, 138 F.3d at 73, 74-75 (Indonesia adequate forum despite unavailability of RICO causes of action); see also, e.g., Capital Currency Exch., N.V. v. National Westminster Bank PLC, 155 F.3d 603, 609-11 (2d Cir. 1998), cert. denied, 119 S. Ct. 1459 (1999) (England adequate forum despite unavailability of Sherman Act and certain common law claims, and despite fact that English courts never had awarded money damages in antitrust case); Murray v. British Broad. Corp., 81 F.3d 287, 292-93 (2d Cir. 1996) (England adequate forum despite plaintiff's claim that American contingency fee system was only way he could afford a lawyer); Transunion Corp. v. Pepsico, Inc., 811 F.2d 127, 129 (2d Cir. 1987) (per curiam) (dismissing in favor of Philippines forum despite unavailability of RICO causes of action and treble damages); Alcoa Steamship Co. v. M/V Nordic Regent, 654 F.2d 147, 159 (2d Cir. 1980) (in banc) (dismissing in favor of Trinidad forum despite likelihood that plaintiff, who potentially could recover $8 million in United States, was limited to $570,000 in Trinidad); Howe v. Goldcorp Investments, Ltd., 946 F.2d 944, 952 (1st Cir. 1991) (dismissing securities fraud case in favor of Ontario forum despite some differences in law).
 
 
 27
 On appeal the DiRienzo plaintiffs contend primarily that the unavailability of a "fraud on the market" theory in Canadian securities law makes Ontario an inadequate forum. That theory, established by the Supreme Court in Basic Inc. v. Levinson, 485 U.S. 224, 247 (1988), makes it unnecessary for a plaintiff to prove specific reliance on false information in claims under §10(b) or Rule 10b-5. Instead, the law presumes that the purchaser relied on the integrity of the process by which a stock price is fixed to reflect accurately all information available in the marketplace. Plaintiffs here argue that Ontario's refusal to adopt this theory makes it an inadequate forum for two related reasons. First, because many potential class members would be unable to allege reliance on the defendants' statements under any other fraud theory, they therefore would be unable to recover damages in Ontario; and second, because absent the fraud on the market theory, the daunting problem of establishing reliance by each class member would require an Ontario court to deny class certification.
 
 
 28
 The first argument made by the DiRienzo plaintiffs is raised for the first time on this appeal. It is well-settled that an appellate court usually will not consider an issue raised for the first time on appeal. See Singleton v. Wulff, 428 U.S. 106, 120 (1976). We may choose to address a new issue given good reason; for example, to remedy an obvious injustice or if the new issue is purely legal, not requiring additional factfinding, and capable of decision on the existing record. See Greene v. United States, 13 F.3d 577, 586 (2d Cir. 1994).
 
 
 29
 We decline to reach these plaintiffs' new argument. It raises complex questions of foreign law: defendants contend that an Ontario court might choose to apply American law to the securities fraud claims, at least as to plaintiffs who reside and bought the securities in the United States. Nor would all the plaintiffs necessarily need to invoke the fraud on the market theory; presumably, some of them can show reliance on the allegedly fraudulent statements. Concededly, some plaintiffs who would have a remedy in American courts under the fraud on the market theory will be unable to prevail in Canada. But it is far from obvious, especially on this record, who those plaintiffs are or how to distinguish them from others who may succeed in Ontario. Certainly as to the named plaintiffs, further factfinding would be required to determine whether they have any way to demonstrate reliance on Philip's statements. If this issue had been raised below, the district court would have been in a better position to address it than we are, particularly with respect to the definition of the proposed class and subclasses.
 
 
 30
 Plaintiffs did raise the second, procedural issue of whether Ontario law would permit class certification in the district court. The court correctly found that procedural differences do not make Ontario an inadequate forum. Cf. In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984, 809 F.2d 195, 199 (2d Cir. 1987) (dismissing U.S. class action in favor of representative suit brought by Indian government in India).
 
 
 31
 The district court cases on which plaintiffs rely, Derensis v. Coopers & Lybrand Chartered Accountants, 930 F. Supp. 1003, 1007 (D.N.J. 1996), and Trafton v. Deacon Barclays de Zoete Wedd Ltd., No. C 93-2758-FMS, Fed. Sec. L. Rep. ¶98,481, available in 1994 WL 746199, at *12 (N.D. Cal. Oct. 21, 1994), appear to hold that Canadian courts' rejection of the fraud on the market theory means that securities class actions cannot go forward in Canada. Such is not necessarily the case. See Maxwell v. MLG Ventures Ltd., 7 Canadian Cases on the Law of Securities 155, 161 (Ont. Ct. Just. (Gen. Div.) Apr. 27, 1995) (certifying class action for securities fraud case based on alleged misrepresentations in offering circular); cf. Carom v. Bre-X Minerals Ltd., Nos. 97-GD-39574, 97-GC-41854, 97-GD-42031, 97-GD-42033, 97-GD-42036, 97-GD-42034, 97-GD-42037, 1999 Ont. Sup. C.J. LEXIS 190, at *46-48, *138-40 (Ont. Super. Ct. Just. Sept. 14, 1999) (certifying securities class action as to some claims, including conspiracy claims against defendant corporation and its directors and employees, but not as to others, such as claims against the brokers and financial analysts).
 
 
 32
 Unlike litigants in U.S. federal court, plaintiffs need not show that common questions "predominate" in order to obtain class certification in Ontario. Compare Fed. R. Civ. P. 23(b)(3) and Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614-17 (1997), with Declaration of Gerard V. LaForest in Support of Defendant Deloitte's Motion to Dismiss at ¶¶12-13, In re Philip Servs., 49 F. Supp. 2d 629 (indicating that Ontario class action law does not require that common questions predominate). Rather, class certification is available in Ontario so long as the class members "raise common issues" and "a class proceeding would be the preferable procedure" for resolving those issues. Class Proceedings Act, R.S.O., ch. 6, §5(1) (1992), available in LEXIS ONTLEG file in the CANADA library. Section (6)(1) of that Act specifically states that class certification may not be denied solely on the grounds that "[t]he relief claimed includes a claim for damages that would require individual assessment after determination of the common issues." Indeed, a class action is already pending in Ontario based on the same alleged fraud as the present cases. See Menegon, No. 4166-CP/98.
 
 
 33
 Plaintiffs also assert that under Canadian law, they would have no viable cause of action against Deloitte or the director-officer defendants and would be left with wholly inadequate remedies against the American underwriter defendants. They rely for that proposition on a negligent misrepresentation case in which the Supreme Court of Canada held that auditors owe no duty of care to the purchasers of their clients' stock. Hercules Managements Ltd. v. Ernst & Young, 146 D.L.R. 4th 577 (Can. 1997), available in 1997 DLR LEXIS 1297. They insist that Canadian courts are likely to extend Hercules Managements to all fraud claims and therefore that they will have no remedy against Deloitte in Canada. We are unpersuaded.
 
 
 34
 Canadian law has not yet foreclosed plaintiffs' fraud claims against Deloitte, let alone the individual defendants, and plaintiffs' own expert does not reach the pessimistic conclusion that plaintiffs present on appeal. See Declaration of D.H. Jack in Support of Plaintiffs' Opposition to Motion to Dismiss at ¶26, In re Philip Servs., 49 F. Supp. 2d 629. In addition, plaintiffs may bring conspiracy and derivative claims against these defendants as well as claims under the Ontario Securities Act, R.S.O., ch. S.5, §§130 and 131 (1990). Their expert does not question the availability of these claims, and plaintiffs concede that the remedies available are almost identical to American remedies.
 
 
 35
 As a consequence, we are satisfied that Ontario is an adequate forum for plaintiffs to litigate the subject matter of DiRienzo plaintiffs' dispute. See Capital Currency, 155 F.3d at 610 (holding that alternative forum adequate so long as plaintiffs have viable legal argument); PT United, 138 F.3d at 74 (noting that adequacy of alternate forum "does not depend on the existence of the identical cause of action"). The differences in law and procedure between the United States and Ontario are not of a kind to render the latter an inadequate forum. The Liff plaintiffs do not challenge the adequacy of the alternate forum. Thus, we agree with the district court's conclusion that the threshold question of whether an adequate alternative forum exists in Ontario must be answered in the affirmative. See In re Philip Servs., 49 F. Supp. 2d at 639.
 
 
 36
 III Presumption in Favor of Plaintiff's Choice of Forum
 
 
 37
 Having found an adequate alternative forum, we turn to the district court's application of the Gilbert test to the choice between Ontario and the Southern District of New York. Gilbert requires us to apply a strong presumption in favor of the plaintiff's chosen forum when weighing the public and private interest factors favoring each location. See Murray, 81 F.3d at 290, and in close cases to defer to plaintiff's choice of forum, see Gilbert, 330 U.S. at 508.
 
 
 38
 The district court erred in concluding that "where, as here, plaintiffs proceed in a representative capacity their choice of forum is entitled to 'less weight'" than the choice of a plaintiff proceeding solely on his own behalf. In re Philip Servs., 49 F. Supp. 2d at 634. After once again reciting the elements of the Gilbert test and the need for "proper deference" to the plaintiffs' choice, the court went on to analyze and balance the Gilbert factors without further reference to the presumption. See id. at 639-43. With regard to Liff, which is a direct action, the district court's decision to accord the plaintiffs' choice of forum less weight was therefore clearly wrong. Even assuming the proposed class action in DiRienzo is certified, the district court failed to give plaintiffs' choice of forum the strong presumption to which it is entitled.
 
 
 39
 In holding that the presumption is weakened in representative suits, Judge Mukasey relied on Koster and on two of his own prior decisions. Especially in light of our recent decision in Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142 (2d Cir. 2000) (decided after Judge Mukasey ruled), we do not believe that Koster supports his reading. The plaintiff in Koster brought a derivative action in the Eastern District of New York against Lumbermens Mutual Casualty Company, an Illinois company, its president and manager, an Illinois citizen, and another Illinois corporation apparently owned by Lumbermens' president. The district court dismissed the case on forum non conveniens grounds, and the Court of Appeals and Supreme Court affirmed. In its discussion of "the special problems of forum non conveniens which inhere in derivative actions," 330 U.S. at 521, the Supreme Court held that the presumption in favor of the plaintiff's home forum is weakened, because "hundreds of potential plaintiffs" could "with equal show of right" have brought suit in their home states, id. at 524; because the plaintiff may be "a mere phantom plaintiff" with no personal knowledge that the trial court would find helpful, id. at 525, 526; and because the court's administrative role in a class proceeding may require consideration of the relation between the forum and the class as a whole, see id. at 525-26.
 
 
 40
 Important to keep in mind is that immediately preceding this discussion in Koster, the Supreme Court focused on the characteristics of a derivative suit, which differ significantly from the class action suit before us. For example, in a derivative action generally only issues of state law are involved and the corporation is the real party in interest, not the shareholder who often has a small financial interest in the suit. See id. at 522-24. The Supreme Court observed that these "peculiarities" of a derivative action "should not be overlooked." Id. at 524. In contrast, the DiRienzo class action involves questions of federal law and the plaintiffs-shareholders are the real parties in interest.
 
 
 41
 Such distinctions highlight why the reasoning of Koster should not be applied to weaken the presumption in favor of the home forum in this case. Such analysis is especially appropriate because as the Supreme Court has repeatedly stated, "[e]ach [forum non conveniens] case turns on its facts;" the doctrine is one of pragmatism and flexibility rather than rigid, bright-line rules. Id. at 528 (quoting Williams v. Green Bay & W. R.R. Co., 326 U.S. 549, 557 (1946)); accord Piper Aircraft, 454 U.S. at 249-50.
 
 
 42
 Beginning with the Koster Court's language pertaining to "phantom plaintiffs," such persons may "make no showing of any knowledge by which [their] presence would help to make whatever case can be made in behalf of the corporation." Id. at 525. In such circumstances, the need for a plaintiff to try a case in his home forum is diminished because he need not be personally present to prosecute the lawsuit in the first instance. We are unsure how there could ever be a "phantom plaintiff" in a class action. If brought pursuant to diversity jurisdiction, each lead plaintiff must satisfy the amount in controversy requirement. See Snyder v. Harris, 394 U.S. 332, 386 (1969). And, federal jurisdiction may not be exercised over claims of class members who fail to satisfy this requirement. See Zahn v. International Paper Co., 414 U.S. 291, 300 (1973). If a class action were brought pursuant to federal question jurisdiction, the lead plaintiff would in most cases have suffered an alleged violation of a federal statutory or constitutional right, making the label "phantom plaintiff" inappropriate.
 
 
 43
 The enactment of the Private Securities Litigation Reform Act of 1995 (Securities Reform Act), Pub. L. 104-67, 109 Stat. 737, (codified in scattered sections between 15 U.S.C. §77 and §79), further reinforces this notion. Under the Securities Reform Act, any class member may move the district court to appoint "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members" as lead plaintiff(s). 15 U.S.C. §77z 1(a)(3)(B)(i). This "most adequate plaintiff" is rebuttably presumed to be the person or group that (a) has filed the complaint or made a motion to be designated as the most adequate plaintiff; (b) has the largest financial interest in the action; and (c) meets the requirements of Rule 23 of the Federal Rules of Civil Procedure. See id. §77z-1(a)(3)(B)(iii)(I). Thus, since a "most adequate plaintiff" can be named in a securities action, that person would be other than a phantom party who has little connection to the substantive matters of the case.
 
 
 44
 The lead plaintiffs in DiRienzo bear out this theory. They made Securities Reform Act motions for appointment and are not like the "mere phantom plaintiff[s]" found in Koster. Rather, they allege substantial damages. For example, lead plaintiff Toll invested $6.4 million in Philip's stock and lead plaintiff Gans invested $3.5 million. The alleged fraud affected the lead plaintiffs more profoundly than most and they therefore have a greater interest than most in the conduct and outcome of this litigation. Further, because each has a direct and significant monetary interest in the outcome of the suit, they are unlike plaintiffs in derivative actions who, as the Koster Court noted, have only an indirect interest in the litigation. See Koster, 330 U.S. at 522-23, 521 (contrasting Williams, 326 U.S. 549, a class action brought by a group of debenture holders).
 
 
 45
 With respect to the Koster Court's instruction to consider the relation of the forum to the class as a whole, the proposed class in DiRienzo consists predominantly of individuals who bought Philip stock in the United States, or who received it in exchange for shares of American companies. Presumably these individuals are Americans, as Canadians were able to buy Philip stock in Canada. While recognizing that the defendants are mostly Canadian citizens, much of the administrative burden on the Southern District of New York - at least as it is set forth in Koster and Rule 23 of the Federal Rules of Civil Procedure - pertains to managing the case with respect to the plaintiffs. Since forum non conveniens common law now applies only to actions sought to be removed to a foreign venue, the two fora at issue are a U.S. court or a Canadian court. With the majority of the DiRienzo plaintiffs residing in the United States, an American court is best suited to handle this litigation.
 
 
 46
 In light of these observations, the language in Koster pertaining to the "hundreds of plaintiffs" can be seen as inapplicable here. Concededly, the American plaintiffs in DiRienzo could have gone to a local courthouse in cities around the country and filed suit, but the significant fact is that all of these courthouses are located in the United States. The DiRienzo plaintiffs want this case tried in the Southern District of New York, not simply because they prefer that location, but because of the substantive benefits they perceive would ensue from trying this case in the United States. They are not claiming the Southern District of New York "is appropriate merely because it is [their] home forum," Koster, 330 U.S. at 524 (emphasis added), but rather because they are plaintiffs who have suffered injury both in New York and in the United States, and seek remedies under federal securities law.
 
 
 47
 The dissent interprets Koster as presenting one key question: "Is the plaintiff proceeding in a representative capacity that may diminish the presumed convenience of the chosen forum?" The foregoing illustrates that the answer is "no," and plaintiffs' choice of forum should be given the full deference due it.
 
 IV Deference to the Choice of a U.S. Forum
 
 48
 Unlike the Koster defendants who sought dismissal in favor of Illinois, the DiRienzo defendants seek dismissal in favor of a foreign country. Dismissal in favor of a foreign forum has effects on the plaintiffs, particularly with respect to the applicable rules of law, that dismissal in favor of another federal district court simply does not. Indeed, as the Supreme Court explained in Piper Aircraft, "[t]he doctrine of forum non conveniens ... is designed in part to help courts [presumably including foreign courts] avoid conducting complex exercises in comparative law." 454 U.S. at 251.
 
 
 49
 The benefits to these class action resident plaintiffs of suing their case in a U.S. forum is not confined to the suit being brought in a given plaintiff's home district. As Guidi stated, the "home forum" of an American citizen for forum non conveniens purposes is any "United States court." 224 F.3d at 146; accord Derensis, 930 F. Supp. at 1009. We recently reaffirmed this holding, by noting that Guidi "illustrates that a plaintiff's U.S. citizenship and residence is entitled to consideration in favor of retaining jurisdiction." Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 102 (2d Cir. 2000). While the Southern District of New York may not have a strong relationship with all of the plaintiffs, the weight of the class certainly is concentrated in the United States. This country's federal courts have a stronger relation to the class as a whole than do Ontario's courts. Our result is not motivated by jingoism, but rather by the sensible consideration that the greater connections a plaintiff has to his chosen forum, the more likely is the inconvenience to him resulting from changing to a foreign forum. See Wiwa, 226 F.3d at 102. The district court therefore should have given full weight to the plaintiffs' choice of forum. Its failure to apply this rule of law was an abuse of its discretion. See id. at 103; Guidi, 224 F.3d at 148.[2]
 
 V Public and Private Interest Factors
 A. Public Interest Factors
 
 50
 We turn finally to the public and private interest factors to see if they shift the balance away from plaintiffs' choice of forum. In Gilbert, the Supreme Court outlined four public interest factors for courts to weigh in the forum non conveniens inquiry: (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the "local interest in having localized controversies decided at home;" and (4) avoiding difficult problems in conflict of laws and the application of foreign law. 330 U.S. at 508-09.
 
 
 51
 1. Administrative Difficulties. The first factor does not strongly favor either party. There is evidence that Ontario courts, like the Southern District of New York, suffer from congestion. There may be some administrative advantage in dismissing DiRienzo in Ontario's favor because Menegon, a similar case involving a class of only Canadian plaintiffs, is already pending there. Although the issues in the two cases will obviously overlap, they also differ somewhat because DiRienzo will involve the contents of American registration statements and the likely application of American law to most of the claims. In any event, this circumstance is of little weight because, as we noted in Guidi, the existence of related litigation is not one of the factors enumerated in Gilbert. See 203 F.3d at 185.
 
 
 52
 2. Jury Duty Imposed on Community With no Relation to Controversy. As explored more fully in the next section, the U.S. has a local interest in this lawsuit. Where American investors have allegedly suffered harm from purchases they made in the United States, local juries have an interest in redressing that harm.
 
 
 53
 3. Local Interest. The district court erred by finding that the local interest factor weighed heavily in favor of litigation in Ontario. See In re Philip Servs., 49 F. Supp. 2d at 642. It failed to acknowledge as a factual matter that many of the plaintiffs' securities transactions were conducted entirely in the United States, by Americans, in American dollars, on American stock exchanges. Its conclusion that "[p]arties who choose to engage in international transactions, as plaintiffs did here, 'cannot expect always to bring their foreign opponents into a United States forum,'" 49 F. Supp. 2d at 642, is inapplicable to the bulk of the American plaintiffs. These plaintiffs bought shares on the NYSE or NASDAQ and relied on statements filed with the SEC, disclosing that most of Philip's business was conducted in the United States; in addition, defendants include Americans as well as foreigners. Admittedly, the Liff plaintiffs and those in the proposed Allwaste and Serv-Tech subclasses received their shares in stock-for-stock exchanges and were presumably aware that they were negotiating with representatives of a Canadian company. However, even they were approached in the United States.
 
 
 54
 The presence of the small minority of potential Canadian class members in DiRienzo who bought their securities in Canada does not change this analysis. In Wiwa, we ruled that the district court applied a "faulty" standard of law in failing to "count in favor of retention [of jurisdiction] that two of the [four] plaintiffs were residents of the United States." 226 F.3d at 103. A fortiori, when more than half of the plaintiffs are U.S. residents, and only a small minority of them reside in Canada, the same principle must govern.
 
 
 55
 The cases the district court cited for its conclusion do not bind us, and two involved facts easily distinguishable from those at bar. In Diatronics, Inc. v. Elbit Computers, Ltd., 649 F. Supp. 122 (S.D.N.Y. 1986), aff'd, 812 F.2d 712 (2d Cir. 1987), an American corporation had purchased a majority interest in one Israeli corporation from a second Israeli corporation. See id. at 123-25. The contracts at issue had been negotiated and executed in Israel, and the purchaser had hired an Israeli attorney for the negotiations. The district court correctly held that the case should be dismissed in favor of Israel as a forum. See id. at 127-30. Similarly, the First Circuit's decision in Howe emphasized that the Canadian stock that was the subject of the alleged securities fraud was traded only on Canadian stock exchanges, and that its sellers had made no effort to market it in the United States except in response to unsolicited inquiries. See 946 F.2d at 953.
 
 
 56
 In other cases where we have affirmed forum non conveniens dismissals, the transactions at issue had little or no connection with the U.S. See, e.g., Alfadda, 159 F.3d at 46-48 (affirming dismissal of Saudi Arabian investors' suit against Netherlands Antilles corporation over conduct of French bank owned by corporation, where all documents and witnesses were in France or Saudi Arabia and documents were in French and no plaintiffs were American); Scottish Air Int'l v. British Caledonian Group, plc, 81 F.3d 1224, 1233-34 (2d Cir. 1996) (affirming dismissal where American shareholder sued over the right to a seat on the board of directors of a Scottish corporation, considered to be a decision of internal management); Alcoa Steamship, 654 F.2d at 149 (affirming dismissal of admiralty action brought by American resident and arising out of the collision of Alcoa's ship with a pier located in Trinidad); Calavo Growers of California v. Belgium, 632 F.2d 963, 965-66 (2d Cir. 1980) (affirming dismissal of breach of contract and fraud action arising out of fig insurance policies negotiated and purchased by parties' brokers in Belgium and possibly involving questions of insurance industry usage in Belgium and the pre-shipment condition of the figs in Turkey).
 
 
 57
 In contrast, DiRienzo and Liff do not involve Americans who sought out involvement with a foreign forum. It was Philip who came to them by registering its stock on American exchanges, filing statements with the SEC, and conducting the bulk of its business - including multiple corporate acquisitions - in the United States.
 
 
 58
 The final case on which Judge Mukasey relied involved facts more similar to those before us. See DeYoung v. Beddome, 707 F. Supp. 132, 133-34 (S.D.N.Y. 1989). In DeYoung the presumption in favor of plaintiffs' chosen forum was discounted because the case was brought as a class action. It appeared clear there that Canadian law would apply, but it is unclear from the opinion how many of the shareholders were American. Further, the case was actually decided on grounds of international comity, see id. at 134, and its forum non conveniens comment was dictum, see id. at 138.
 
 
 59
 Most of the plaintiffs here were Americans who conducted the disputed transactions entirely in the United States and relied on statements filed with the SEC. This lawsuit is not simply about "the conduct of a major corporation in Canada, notwithstanding the involvement of some American entities and persons," as described by the district court. See In re Philip Servs., 49 F. Supp. 2d at 642. Rather, the plaintiffs are involved in this lawsuit precisely because of aggressive techniques by the Canadian corporation within the U.S. that targeted U.S. investors. To describe the transactions as did the district court is to misconstrue the factual basis for the lawsuits.
 
 
 60
 As the SEC argues in its amicus curiae brief, dismissing this case is no more appropriate than dismissing a products liability case brought in the United States against Toyota simply because the design and manufacture of the automobile took place in Japan. While the complaint alleges a fraud that was largely executed in Ontario, neither the dissemination of the allegedly misleading statements nor the plaintiffs' losses were localized there.
 
 
 61
 Because the Gilbert test is so fact-specific, a district court's erroneous understanding of facts central to a case can preclude a reasonable balancing of the Gilbert factors and form the basis for reversal on appeal. See R. Maganlal, 942 F.2d at 168 (district court abused its discretion where its misidentification of the "fundamental issue in the case" "tainted the court's entire forum non conveniens analysis"); Overseas Programming Cos., Ltd. v. Cinematographische Commerz-Anstalt, 684 F.2d 232, 235 (2d Cir. 1982) (district court erred in its balancing of the Gilbert factors because it "failed to identify the basic issue in the lawsuit.").
 
 
 62
 4. Avoiding Conflicts of Law Problems. The district court correctly noted that while an Ontario court would likely apply American law to at least the claims arising under §§11 and 12(a) of the Securities Act, an American court would likely apply Canadian law to claims by non-resident class members based on the purchase of securities outside the United States. See Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 127-29 (2d Cir. 1998), cert. denied, 119 S. Ct. 1029 (1999); Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 993 (2d Cir. 1975). Thus the interest in avoiding the application of foreign law does not favor either forum.
 
 
 63
 But the district court failed to give sufficient weight to the United States' interest in having its securities laws govern the protection of U.S. investors and its interest in the integrity of the U.S. securities market. The district court noted the interest but emphasized repeatedly that it is not "determinative" or "overriding" and noted the foreign forum's interest in applying its own securities laws. In re Philip Servs., 49 F. Supp. 2d at 642-43. We have recognized the interest courts of the United States have in enforcing United States securities laws. See Alfadda, 159 F.3d at 47; Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 1002 (2d Cir. 1993). On these facts, this factor deserved a great deal more weight than the district court accorded it.
 
 
 64
 Further, there is a strong public interest favoring access to American courts for those who use American securities markets. The fraud on the market theory itself illustrates investors' reliance on accurate and complete information. For securities markets to function efficiently, securities fraud law must be clear and enforceable. See Basic, 485 U.S. at 245-47. As the statute explaining the need for regulation and control of transactions in securities exchanges and over-the-counter markets states, these transactions are "affected with a national public interest." Securities Exchange Act of 1934, §2, 48 Stat. 881, 15 U.S.C. §78b. Thus, those laws must also be applied consistently with regard to the significant majority of the putative class who bought their securities on American markets.
 
 
 65
 Moreover, the United States has a strong interest in enforcing its securities laws. Cf. Howe, 946 F.2d at 953 (explaining that federal securities laws are not meant to protect those who purchased their securities abroad). Ontario has an analogous interest with respect to Canadians who bought their Philip stock in Ontario, but they are a small minority of the proposed class and Ontario's interest is correspondingly less. As to the Liff plaintiffs, they acquired all their Philip shares in stock-for-stock exchanges negotiated in or from the United States. Ontario therefore has little interest in enforcing its securities laws with respect to them. Hence, the public interest factors strongly favor an American forum for this securities litigation.
 
 B. Private Interest Factors
 
 66
 The private interest factors enumerated in Gilbert include: (1) ease of access to evidence; (2) the availability of compulsory process to compel the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of premises; and (5) all other factors that might make the trial quicker or less expensive. See Gilbert, 330 U.S. at 508; Alfadda, 159 F.3d at 46. Only the first two Gilbert private interest factors, ease of access and the availability of compulsory process, are relevant in the present cases.
 
 
 67
 As we analyze these private factors, we reiterate that plaintiffs should not be deprived of their choice of forum, except upon defendants' clearly showing that a trial there would be so oppressive and vexatious to defendant as to be out of all proportion to plaintiffs' convenience. See Koster, 330 U.S. at 524. We do not think defendants have made such a showing. With respect to the first factor, the bulk of the relevant documents do appear to be in Ontario, at either Philip's or Deloitte's Hamilton facilities. However, the need to photocopy and ship documents is hardly unprecedented in American litigation. Cf. Itoba Ltd. v. LEP Group PLC, 930 F. Supp. 36, 44 (D. Conn. 1996) ("To the extent documents exist in England, advances in transportation and communication accord this issue less weight."). Nor have the defendants explained how these tasks would be "oppressive" or "vexatious."
 
 
 68
 With respect to process to compel unwilling witnesses, it appears that most of the potential witnesses with direct knowledge of the alleged fraud are also located in Ontario. (In Liff, which involved negotiations, the testimony of the American plaintiffs will be more important than in DiRienzo.) However, willing witnesses can easily travel from Toronto to New York by a direct 90-minute flight. Hamilton is less than an hour's drive from Toronto. Such travel is not burdensome by modern standards, and the defendants have not shown otherwise.
 
 
 69
 The most important problem with conducting this litigation in the United States is the unavailability of process to compel unwilling witnesses. Former Philip employees such as Peter McQuillan, the former comptroller of Philip's Scrap Metals Division, reside in Canada and thus are not subject to process in American courts. Unlike an American court, a Canadian court could compel Canadian witnesses to testify. Live testimony is especially important in a fraud action where the factfinder's evaluation of witnesses' credibility is central to the resolution of the case. See Alfadda, 159 F.3d at 48; Schertenleib, 589 F.2d at 1165.
 
 
 70
 Despite the fact that this factor weighs in favor of Ontario, we note that the district court failed to consider letters rogatory to compel these witnesses' appearance for deposition, even though we have recognized the availability of this procedural tool as relevant in deciding whether plaintiffs' chosen forum is inconvenient. See, e.g., Overseas Programming Cos., 684 F.2d at 235 ("any difficulties ... regarding witnesses whose attendance the Court is unable to compel can most likely be resolved by the use of deposition testimony or letters rogatory"); see also In re Livent, Inc., 78 F. Supp. 2d 194, 211 (S.D.N.Y. 1999). Although demeanor evidence is important when trying a fraud case before a jury, see Howe, 946 F.2d at 952, videotaped depositions, obtained through letters rogatory, would afford the jury an opportunity to assess the credibility of these Canadian witnesses.
 
 
 71
 Consequently, on the evidence presented, the private interest factors fall far short of clearly showing that trial in the Southern District is oppressive or vexatious to defendants. As a consequence, the public and private interest factors have not overcome the strong presumption that must be accorded plaintiffs' choice of forum. Even were the balance of factors considered close, Gilbert tells us we must defer to plaintiff's choice because unless the balance strongly favors defendant, plaintiffs' choice of forum "should rarely be disturbed." 330 U.S. at 508.
 
 CONCLUSION
 
 72
 In sum, the district court erred in both DiRienzo and Liff by giving less deference to the plaintiffs' choice of forum and by failing to accord proper significance to the choice of a U.S. forum by the American plaintiffs. The district court abused its discretion by allowing these errors to infect its Gilbert analysis, especially with respect to the interest of the U.S. in deciding these matters which arose out of the sales of securities in this country.
 
 
 73
 Accordingly, the orders dismissing the DiRienzo action and the Liff action on the grounds of forum non conveniens are reversed and the cases are remanded to the Southern District of New York for further proceedings. We decline the Liff plaintiffs' request that we remand their case to the District of Tennessee on the understanding that pre-trial proceedings are not yet complete.
 
 
 
 NOTES:
 
 
 *
 Hon. David G. Trager, United States District Court Judge for the Eastern District of New York, sitting by designation.
 
 
 [1]
 Unless otherwise noted, all figures stated are in U.S. dollars. The Treasury Department advises that the exchange rate for March quarter 1998 was Cdn.$1.00 = U.S.$0.7048.
 
 
 [2]
 Guidi and Wiwa are not limited to their facts, as the dissent argues. In Guidi, after concluding the defendant "did not carry its burden under Gilbert and Koster to demonstrate that the balance of conveniences tipped strongly in its favor," we observed that "the substantial and unusual emotional burden on Plaintiffs" if the case were tried in Egypt "provides additional support for keeping the case in their chosen forum." 224 F.3d at 147 (emphasis added). The use of the phrase "additional support" suggests we would have found in the plaintiffs' favor in any event. Nor is the analysis in Wiwa based on the particular facts of that case either. Rather, the opinion notes that when deciding a motion to dismiss under forum non conveniens our case law and that of the Supreme Court have established a rule of deference to a U.S. forum for a U.S. resident plaintiff. See 226 F.3d at 102.
 
 
 
 74
 A. CABRANES, Circuit Judge, dissenting from the majority opinion:
 
 
 75
 I respectfully dissent from the majority opinion reversing the decision of the District Court to dismiss these suits on the ground of forum non conveniens. The majority opinion places unnecessary and novel restrictions on what until now has been a district court's broad discretion to grant forum non conveniens dismissal in any action in which some of the plaintiffs reside in the United States. If this ruling stands-and I hope that it will not-a new doctrinal approach, invented today, will govern such lawsuits.
 
 
 76
 I would remand Liff for the reasons stated at III below, and I would affirm DiRienzo for reasons well stated by Judge Mukasey in his careful and comprehensive opinion, see In re Philip Services Corp. Sec. Litig., 49 F. Supp. 2d 629, 634 (S.D.N.Y. 1999) ("DiRienzo"). The majority errs, in my view, by: (1) paying mere lip service to the proper standard of review-for clear abuse of discretion-while unabashedly substituting its own views for those of the District Court; (2) improperly criticizing the District Court for characterizing the relevant transactions as international; (3) concluding that the United States' interest in enforcing its securities laws is entitled to "a great deal more weight" than was afforded by the District Court, despite the fact that we have repeatedly stated that this interest is merely "one consideration"; (4) dismissing the District Court's consideration of the location of the bulk of the relevant documentary evidence in the alternative forum, even though we have made it clear that this is a legitimate factor for a trial court to weigh in any forum non conveniens analysis; (5) ignoring those cases in which we have expressed a clear preference for live witness testimony, especially in fraud actions; and (6) incorrectly affording a strong presumption to the forum choice of plaintiffs who are not alleged to reside in the purported "home forum" and who seek to represent a class of investors stretching across the United States and Canada.
 
 
 77
 We have only recently recalled that our "review of a forum non conveniens dismissal is severely cabined. The decision lies wholly within the broad discretion of the district court and should be reversed only if that discretion has been clearly abused." Alfadda v. Fenn, 159 F.3d 41, 45 (2d Cir. 1998) (internal citations, alteration, and quotation marks omitted); see also Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257 (1981); Scottish Air Int'l, Inc. v. British Caledonian Group PLC, 81 F.3d 1224, 1232 (2d Cir. 1996) (Cardamone, J.) ("our review in this area of law is quite constrained"). The majority misapplies this standard of review, ignores binding precedents of our own Court, and incorrectly interprets the seminal Supreme Court decision on point.
 
 
 78
 In undertaking a forum non conveniens analysis, a court first must determine whether there exists an adequate alternative forum, and then, if there is such a forum, must weigh the relevant public and private interest factors to determine which forum "will be most convenient and will best serve the ends of justice." Alfadda, 159 F.3d at 45-46 (internal quotation marks omitted). In assessing convenience, there "is ordinarily a strong presumption in favor of the plaintiff's choice of forum." Murray v. BBC, 81 F.3d 287, 290 (2d Cir. 1996). Because I agree with the majority that Canada is an adequate forum in which to litigate these actions, I first discuss the majority's improper handling of the public and private interest factors and then turn to whether the usual "strong presumption" in favor of the plaintiffs' choice of forum should apply in a representative action in which the plaintiff class is spread across the United States and Canada.[1]
 
 
 79
 I. The District Court Did Not Clearly Abuse its Discretion in Weighing the Gilbert Factors
 
 
 80
 We have explained that in a forum non conveniens analysis
 
 
 81
 [t]he public interests to be considered include: (1) having local disputes settled locally; (2) avoiding problems of applying foreign law; and (3) avoiding burdening jurors with cases that have no impact on their community. The private interests embrace: (1) ease of access to evidence; (2) the cost for witnesses to attend trial; (3) the availability of compulsory process; and (4) other factors that might shorten trial or make it less expensive.
 
 
 82
 Capital Currency Exch., N.V. v. National Westminster Bank PLC, 155 F.3d 603, 609 (2d Cir. 1998), cert. denied, 526 U.S. 1067 (1999); see also Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947). Before today it was the rule that the decision "to grant or deny a motion to dismiss a cause of action under the doctrine of forum non conveniens lies wholly within the broad discretion of the district court and may be overturned only when we believe that discretion has been clearly abused." Scottish Air, 81 F.3d at 1232. At every stage of its analysis of the District Court's balancing of the Gilbert factors, the majority strays far beyond this "extremely limited" review, Capital Currency, 155 F.3d at 609.
 
 
 83
 Judge Mukasey, after a thoughtful review of the record, concluded that the public interest factors were in relative equipoise and that the private interest factors strongly favored litigation in Ontario. See DiRienzo, 49 F. Supp. 2d at 640-43. These conclusions are well-grounded in the record and well within a district court's sound discretion; they should not be disturbed.
 
 
 84
 A. The District Court Did Not Clearly Abuse its Discretion in Weighing the Public Interest Factors
 
 
 85
 With regard to the public interest factors, Judge Mukasey found that: (1) neither docket congestion nor potential problems in applying foreign law favored one forum over another, see id. at 642; (2) the interest in having local controversies settled locally favored litigation in Ontario, because the matter concerns the conduct in Canada of a Canadian corporation, see id. (citing Alfadda, 159 F.3d at 46 (concluding that France had a "far greater interest" in litigation concerning the conduct of a French bank than did the United States)); and (3) while the United States has an interest in applying its own securities laws, that interest is not overriding, see id. at 642-43 (citing Alfadda, 159 F.3d at 47, and Capital Currency, 155 F.3d at 611).
 
 
 86
 In concluding that the private interest factors weighed heavily in favor of dismissal and litigation of the cause in Ontario, Judge Mukasey relied on: (1) the availability in Ontario of several important third-party witnesses who would not be subject to subpoena in the Southern District of New York;[2] (2) the location of most if not all of the important defendants and defense witnesses in Ontario, where Philip is headquartered; and (3) the fact that the "vast bulk" of the relevant documentary evidence is located in Ontario. See id. at 640-41. Our recent decisions demonstrate that each of these is an appropriate consideration in deciding whether to dismiss on the ground of forum non conveniens, see Alfadda, 159 F.3d at 47-48; Capital Currency, 155 F.3d at 611, and it is clear that Judge Mukasey properly exercised his discretion in balancing the private interest factors. The majority's conclusion otherwise is flatly at odds with our cases.
 
 
 87
 1. The Relevant Transactions Were "International"
 
 
 88
 The majority's conclusion that Judge Mukasey clearly abused his discretion in weighing the Gilbert factors is based on a number of dubious grounds. First, the majority criticizes at length Judge Mukasey's characterization of the relevant purchase transactions as "international." DiRienzo, 49 F. Supp. 2d at 642. According to the majority, this characterization "misconstrue[s] the factual basis for the lawsuits," anteat 65 and led Judge Mukasey to an "erroneous understanding of the facts central to [the] case" ante at 65 and, thus, to an unreasonable balancing of the Gilbertfactors. The majority's position is not supported by the record. First, it is undisputed that "Philip is a Canadian corporation which maintains its principal executive offices" in Hamilton, Ontario, Canada. Second, approximately $94 million of the $380 million of Philip common stock offered by the company in the relevant period was sold by Canadian underwriters to investors outside the United States; these investors are members of the proposed DiRienzo class. Finally, a large percentage of the proposed class received Philip stock when Philip acquired American companies in stock swaps; it cannot seriously be disputed that the acquisition of an American company by a Canadian company is an international transaction. In light of the evidence in the record, the criticism of the District Court for having described the relevant transactions as "international" is misplaced.
 
 
 89
 The majority appears intent on proving that the transactions at issue in this case were connected to the United States and that we have only affirmed forum non conveniens dismissals in cases where "the transactions at issue had little or no connection with the U.S." Ante at 64. However, none of our prior cases establishes any ceiling of connection to the United States above which forum non conveniens dismissal is unavailable. Moreover, it seems unlikely that such a ceiling could be established-even if one were desirable-because of the difficulty of articulating absolute criteria by which to measure connections to the United States against competing connections to a foreign country.
 
 
 90
 2. The United States' Interest in Enforcing its Securities Laws is "Merely One Consideration"
 
 
 91
 After insisting that the transactions in question were connected to the United States, the majority criticizes the District Court's conclusion that Ontario's interest in DiRienzo outweighs the United States' interest. Interestingly, the majority does not claim that Ontario lacks a substantial interest in hearing the case, or that the District Court improperly considered this interest in its Gilbert analysis. Nor could it fairly do so, for the District Court's consideration of the alternative forum's interest is fully consistent with our prior decisions. See, e.g., Alfadda, 159 F.3d at 46; Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 1002 (2d Cir. 1993). Instead, the majority simply finds that the District Court "failed to give sufficient weight to the United States' interest in having its securities laws govern the protection of U.S. investors and its interests in the integrity of the U.S. securities market." Ante at 65. Nowhere is it more obvious that, instead of reviewing for "clear abuse of discretion," the majority opted to undertake its own de novo review, simply substituting its view of the matter for that of the District Court.
 
 
 92
 It is no coincidence that the majority fails to account for our recent statement that the interest of the United States in enforcing its securities laws "is merely one consideration to be weighed in the totality of the Gilbert analysis." Alfadda, 159 F.3d at 47 (emphasis added) (affirming forum non conveniens dismissal of securities action); see also Allstate, 994 F.2d at 1002 (same) (citing Howe v. Goldcorp Investments, Ltd., 946 F.2d 944, 950 (1st Cir. 1991) (Breyer, C.J.) (same)). It is not disputed that the District Court, in its DiRienzo opinion, considered the interest of the United States in enforcing its own securities laws in weighing the relative public interests in hearing the case. DiRienzo, 49 F. Supp. 2d at 643. Indeed, the majority concedes that "[t]he district court noted the [United States'] interest," but nevertheless complains that the District Court "emphasized repeatedly that [the interest] is not 'determinative' or 'overriding' and noted the foreign forum's interest in applying its own securities laws." Ante at 65. The District Court gave the matter exactly what Alfadda requires: consideration.[3] In demanding heightened consideration of the United States' interest, the majority substitutes its own views of the proper balance for those of the District Court, in plain disregard for our precedents and the applicable standard of review.
 
 
 93
 B. The District Court Properly Weighed the Private Interest Factors
 
 
 94
 1. The District Court Properly Considered the Location of the Relevant Documentary Evidence
 
 
 95
 The majority's criticism of the District Court's balancing of the private interest factors is similarly misguided. First, it takes issue with the District Court's decision to place some weight on the fact that "the vast bulk of the relevant documentary evidence is in Ontario," DiRienzo, 49 F. Supp. 2d at 641, informing us that "the need to photocopy and ship documents is hardly unprecedented in American litigation," ante at 66 (relying on an opinion of the District of Connecticut as authority). No one disputes-no one can dispute-that "the need to photocopy and ship documents is hardly unprecedented in American litigation." However, the relevant issue here is not whether there are precedents for photocopying and shipping documents, but whether the District Court clearly abused its discretion in taking into account the location of the "vast bulk" of the documentary evidence. The answer, clearly, is "no." In both Alfadda and Capital Currency, we noted with approval that the trial courts had concluded that private interest factors strongly favored litigation in the alternative fora, partly because "nearly all the documentary evidence," Alfadda, 159 F.3d at 47 (emphasis in original), or "most of the documentary evidence," Capital Currency, 155 F.3d at 611, was located abroad, see also Scottish Air, 81 F.3d at 1233. There can be no doubt that the District Court's consideration of the situs in Ontario of the "vast bulk of the relevant documentary evidence" was wholly appropriate.
 
 
 96
 2. The District Court's Balancing Properly Reflects Our "Strong Preference" for Live Witness Testimony, Particularly in Fraud Actions
 
 
 97
 Moreover, the majority unconvincingly attempts to diminish the importance of the District Court's finding that "it is in Ontario that most of the key witnesses . . . can be found," a fact that the District Court properly concluded was "most significant." DiRienzo, 49 F. Supp. 2d at 640. We have explained that "[t]he ability to secure witness testimony takes on added importance . . . because 'where, as here, appellants have alleged fraud, live testimony of key witnesses is necessary so that the trier of fact can assess the witnesses' demeanor.'" Alfadda, 159 F.3d at 48 (emphasis added) (quoting Allstate, 994 F.2d at 1001); see also Scottish Air, 81 F.3d at 1233 (live witness testimony crucial for jury to assess witness credibility, notwithstanding possibility of deposition); Howe, 946 F.2d at 952 ("fraud and subjective intent are elements of the claim, making the live testimony of witnesses for the purposes of presenting demeanor evidence essential to a fair trial" (emphasis added)); Schertenleib v. Traum, 589 F.2d 1156, 1165 (2d Cir. 1978) (explaining that "[s]ince the crux of this litigation is the truth or falsity of [defendant's] charges that plaintiff is a swindler, to be able to take the alleged co- conspirators' testimony by letter rogatory only would be a very serious handicap" in that it would prevent "live cross-examination before a factfinder"(emphasis added)). Accordingly, it was entirely appropriate for the District Court to emphasize this factor in determining that the private interest factors strongly favor litigation in Ontario.
 
 
 98
 With but a glancing acknowledgment of our cases asserting a clear preference for live testimony in a fraud action, see ante at 66, the majority notes that "the district court failed to consider letters rogatory to compel these witnesses' appearance for deposition," ante at 66, as well as the possibility of showing the jury videotaped depositions. The majority further states that "we have recognized the availability of [letters rogatory] as relevant in deciding whether plaintiffs' chosen forum is inconvenient. See, e.g., Overseas Programming Cos. v. Cinematographische Commerz-Anstalt, 684 F.2d 232, 235 (2d Cir. 1982)." Ante at 66. This statement is misleading. In Overseas Programming we specifically concluded that "many of the relevant witnesses reside or are doing business in the United States, which makes New York a more convenient forum than any one of the foreign locations in which litigation has already been commenced." Overseas Programming, 684 F.2d at 235. In DiRienzo, by contrast, the District Court concluded-andthe majority does not dispute-that "most of the key witnesses" are to be found in Ontario, where a parallel action has been commenced. DiRienzo, 49 F. Supp. 2d at 640. We have never before required, as the majority does here, that a district court consider the use of videotaped testimony in weighing this factor, see Alfadda, 159 F.3d at 48;[4] Allstate, 994 F.2d at 1001, and we have specifically rejected similar attempts to substitute some other form of testimony in lieu of live witness testimony before the trier of fact, see Scottish Air, 81 F.3d at 1233; Schertenleib, 589 F.2d at 1165. In concluding that the District Court clearly abused its discretion by failing to consider that the videotaped testimony of non-available, crucial witnesses could be offered in place of live testimony, the majority has simply elected to ignore our prior decisions.
 
 
 99
 For all these reasons, I dissent from the majority's conclusion that the District Court clearly abused its discretion in weighing the Gilbert factors and dismissing the DiRienzo action on forum non conveniens grounds. Accordingly, I would affirm the dismissal.
 
 
 100
 II. The DiRienzo Plaintiffs' Choice of Forum Was Not Entitled to a Strong Presumption
 
 
 101
 Although the majority distorts or ignores a host of controlling decisions, its unduly narrow interpretation of Koster v. (American) Lumbermens Mutual Casualty Co., 330 U.S. 518 (1947), merits particular attention. As Judge Mukasey recognized, in adjudicating a motion to dismiss on the ground of forum non conveniens, "[t]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum. Thus, dismissal usually is not appropriate unless the balance of convenience tilts strongly in favor of trial in the foreign forum." DiRienzo, 49 F. Supp. 2d at 634 (alteration in original) (internal citation and quotation marks omitted). However, as he noted, the Supreme Court has stated that this presumption is entitled to less weight when a plaintiff chooses to proceed on behalf of a broad class of plaintiffs, each of whom has an equal right to litigate in his home forum. See id. (citing Koster, 330 U.S. at 524). The majority concludes-in my view, incorrectly-that the Koster limitation on the "strong presumption" generally afforded to a plaintiff's chosen forum does not apply in DiRienzo.
 
 
 102
 A. The Majority Misstates the District Court's Conclusion
 
 
 103
 The majority concludes that the District Court erred in "fail[ing] to give plaintiffs' choice of forum the strong presumption to which it is entitled." Ante at 60. This criticism, however, is flatly wrong. As the District Court noted, the forum choice of plaintiffs who have opted to represent the interests of a class of investors spread across the continent is entitled to "less weight" than the choice of a plaintiff proceeding only on his own behalf. DiRienzo, 49 F. Supp. 2d at 634 (emphasis added).
 
 
 104
 B. Koster Should Not be Confined to Derivative Actions
 
 
 105
 In criticizing the the District Court, the majority misinterprets the very thrust of Koster and, thus, its application to DiRienzo. Koster involved a derivative action brought by a policyholder of Lumbermens Mutual on behalf of all its members and policyholders. See Koster, 330 U.S. at 519. Affirming dismissal on the ground of forum non conveniens, the Supreme Court explained:
 
 
 106
 Where there are only two parties to a dispute, there is good reason why it should be tried in the plaintiff's home forum if that has been his choice. He should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems. In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown. But where there are hundreds of potential plaintiffs, all equally entitled voluntarily to invest themselves with the corporation's cause of action and all of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened.
 
 
 107
 Id. at 524 (emphasis added). This principle is fully applicable in DiRienzo.
 
 
 108
 Though Koster concerned a derivative action-hence the reference above to "the corporation's cause of action"-the logic of the opinion applies with equal force to other representative actions. Here, as in Koster, the lead plaintiffs assumed responsibility for representing the interests of many others. The parties do not dispute, and the majority does not deny, that each member of the proposed class-at least each member residing in the United States-could have filed a complaint at his local courthouse in Chicago, Sacramento, or Tallahassee, asserting substantive claims identical to those set forth in the DiRienzo complaint. Faced with a similar situation in Koster, the Supreme Court concluded that "where there are hundreds of potential plaintiffs . . . all of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened." Id. So too in this case. Having made a strategic choice to proceed on behalf of an international class, the DiRienzo plaintiffs have no legitimate grounds to complain of the consequences.
 
 
 109
 Judge Mukasey's conclusion that the forum chosen by representative plaintiffs proceeding on behalf of a class dispersed across the continent is entitled to less weight is dictated by simple logic. In a direct action, a plaintiff's choice of forum is afforded a strong presumption because it is assumed that the home forum is the most convenient venue for the plaintiff. See Piper Aircraft, 454 U.S. at 255-56 (explaining that "a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum. When the home forum has been chosen, it is reasonable to assume that this choice is convenient." (citation omitted)); see also Murray, 81 F.3d at 290. However, as the Supreme Court recognized in Koster, that presumption makes little sense when the plaintiffs are dispersed across the nation and have had the forum selected for them by a representative plaintiff. Accordingly, there is no reason to confine the teaching of Koster to derivative actions. Although the majority points to some differences between this case and a derivative action, see ante at 60-61, its analysis is not dispositive of why Koster's rationale should not apply with equal force to the representative action at stake in DiRienzo, in which the plaintiffs likewise are found throughout the nation (not to mention Canada).[5]
 
 
 110
 Following Koster, a district court should discount a plaintiff's forum choice after asking a single question: Is the plaintiff proceeding in a representative capacity that may diminish the presumed convenience of the chosen forum? Judge Mukasey considered the evidence and answered "yes" to that question. The bedrock of our forum non conveniens jurisprudence has always been that an appellate court should not substitute its own answer in place of the "sound discretion" of the district judge, who is closest to the case.
 
 
 111
 C. The Lead Plaintiffs' Financial Stake in the Action is Irrelevant
 
 
 112
 In concluding that Judge Mukasey misapplied Koster because the DiRienzo representatives are not "mere phantom plaintiff[s]," but instead have a significant financial stake in the action, ante at 61, the majority further distorts the language and logic of Koster. The passage in Koster from which the majority draws the notion of a "mere phantom plaintiff" reads as follows:
 
 
 113
 While, even in the ordinary action, the residence of the suitor will not fix the proper forum without reference to other considerations, it is a fact of high significance. But, in derivative actions, although the plaintiff may have a substantial interest of his own to protect, he may also be a mere phantom plaintiff with interest enough to enable him to institute the action and little more. He may have taken some active part in the corporate affairs, or have personal knowledge of them, or have had dealings in course of protest and objection which make it requisite or at least expedient for him personally to be present at the trial. Or he may, like this plaintiff, make no showing of any knowledge by which his presence would help to make whatever case can be made in behalf of the corporation.
 
 
 114
 Koster, 330 U.S. at 525 (emphases added) (internal quotation marks omitted). Thus, the Supreme Court made it clear in Koster-in the very paragraph from which the majority quotes but a fragment, out of context-that the lead plaintiff in some representative actions will have a substantial stake in the litigation, but nonetheless will not be entitled to the usual strong presumption in favor of his choice of forum. The presumption, then, turns not on the extent of the lead plaintiff's financial interest, but rather, on whether the action is brought solely on the plaintiff's own behalf or on behalf of others as well. The majority to the contrary notwithstanding, under Koster, the fact that DiRienzo and the other named plaintiffs in the proposed class have a substantial financial stake in the action is of no importance in determining whether their forum choice is entitled to a strong presumption. Unsurprisingly, the majority fails to quote in full the relevant passage from Koster; in the parlance of securities law, this is a material omission.
 
 
 115
 D. The PSLRA Also is Irrelevant in this Context
 
 
 116
 The majority's crabbed reading of Koster rests not only on its misreading of that case, but also on its erroneous conclusion that Koster is less relevant to securities fraud class actions in light of the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (codified at 15 U.S.C. §§ 77k, 77l, 77z-1, 77z-2, 78a, 78j-1, 78t, 78u, 78u-4, 78u-5). Under that statute, the "most adequate" lead plaintiff in a securities fraud class action is presumed to be the suing party with "the largest financial interest in the relief sought by the class." 15 U.S.C. § 77z-1(a)(3)(B)(iii). Relying on this recent reform, the majority suggests that the lead plaintiffs in DiRienzo had the right to litigate at home. However, the PSLRA does not vest in any plaintiff a greater right to litigate at home than any other plaintiff; rather, it merely identifies the plaintiff who is presumed to be the best class representative. Accordingly, the PSLRA does not change the fact that all (domestic) securities fraud class members could (as in Koster) "with equal show of right go into their many home courts" and assert their claims.[6] Thus, the PSLRA does not displace Koster, and it did not compel Judge Mukasey to keep DiRienzo in the Southern District of New York.[7]
 
 
 117
 E. Koster Applies Without Regard to the Location of the Alternative Forum
 
 
 118
 The majority's conclusion that Koster is inapposite because the alternative forum in the instant case is foreign and the proposed class is largely made up of American investors lacks any discernible basis in Koster or its progeny; indeed, the majority does not trouble to try to identify language in Koster to support its novel stance. As it happens, Koster did emphasize that courts generally must respect a plaintiff's interest in convenience, as reflected by his choice of a particular forum, but that a plaintiff's choice (logically) is entitled to less weight when the plaintiff class is dispersed across the nation. See Koster, 330 U.S. at 524. The reasoning in Koster on this point does not depend in any way on the location of the particular alternative forum.
 
 
 119
 Rather than rely on the Supreme Court's decision in Koster, the majority looks instead to our recent decisions in Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142 (2d Cir. 2000) and Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88 (2d Cir. 2000), two cases that did notinvolve representative plaintiffs proceeding on behalf of larger classes, for support of the inventive, and surprising, proposition that "the 'home forum' of an American citizen for forum non convenienspurposes is any 'United States court.'" Ante at 62. In Guidi, we reversed a trial court's decision to dismiss on forum non conveniens grounds a wrongful death action brought by the American survivor-and American relatives of the deceased victims-of a terrorist attack in Egypt. See id. at 143. Even a cursory reading of Guidi makes clear that the case is limited to its highly unusual facts, as we explicitly stated: "In this case, Plaintiffs argue-and we agree-that their 'home forum' as American citizens is a United States court." Id. at 146 (emphasis added); see also id. at 147 n.4 (explaining that "the states where Plaintiffs reside are not relevant to the forum non conveniens analysis in this case." (emphasis added)). At every stage of Guidi, we noted the extremely unusual context of the case, with the alternative forum being Egypt, the very country in which the gruesome terrorist acts underlying the matter had occurred. We explained:
 
 
 120
 In the balancing of conveniences, we believe that the substantial and unusual emotional burden on Plaintiffs if they were required to travel to Egypt provides additional support for keeping the case in their chosen forum of New York.
 
 
 121
 Plaintiffs are atypical in that they are either the widows or victim of a murderous act directed specifically against foreigners. Understandably, they are strongly adverse to litigating in a country where foreigners have been the target of hostile attacks, and have concerns for their own safety if required to travel there to bring their suit. Plaintiffs have supplied us with ample evidence of terrorist attacks occurring after the events giving rise to their action . . . which give credence to Plaintiffs' uncertainty as to the safety of American visitors to Egypt insofar as fear of religious extremism is concerned.
 
 
 122
 In its forum non conveniens analysis, the district court did not mention, much less give any weight to, the emotional burden faced by Plaintiffs if the case were to be heard in Egypt. . . . We believe that justice is best served in this case by acknowledging the unique and heavy burden placed on Plaintiffs if they are required to litigate in Egypt. In balancing the interests at stake for purposes of forum non conveniens, the district court should have taken into account the unusual circumstances of Plaintiffs that weigh strongly in favor of the New York forum.
 
 
 123
 Id. at 147 (emphases added); see also id. at 144 (noting plaintiffs' claim that they "were emotionally unable to travel to Egypt for a trial"); id. at 145 ("the special circumstances presented by this case-specifically, the emotional burden on Plaintiffs of returning to the country where they or their loved ones were shot in an act of religious terrorism-provide additional weight for favoring" plaintiffs' forum choice); id. at 147 (explaining that plaintiffs "are ordinary American citizens for whom litigating in Egypt presents an obvious and significant inconvenience, especially considering their adverse experience with that country to date").
 
 
 124
 Guidi is not weighed down with these qualifications because the panel was unsure of its decision, but rather because Guidi was in fact an "atypical" case. In most forum non conveniens cases, a court is called upon to balance logistical inconveniences-how far the parties must travel, where the evidence and witnesses are located, and so on. In such cases, it makes sense to characterize a particular state as a (domestic) plaintiff's home forum; Maine, for instance, is closer to Canada than Hawaii, and when the concern is logistical inconvenience, it defies common sense to treat Maine and Hawaii as the same. In Guidi, however, the relevant inconvenience was not logistical, but psychological-the "emotional burden" of traveling to Egypt would have been difficult, and perhaps impossible, for the Guidi plaintiffs to bear. In that "unique" circumstance, it made sense to treat plaintiffs' home forum as the United States. The distance between plaintiffs' residences and downtown Manhattan was immaterial; what mattered was that neither place was in Egypt.
 
 
 125
 The instant case is hardly "atypical" in this way, and the asserted burdens of litigating this securities action in Canada are logistical, not emotional. Accordingly, there is no room in this case-or, indeed, in the mainstream of forum non conveniens law-for the Guidi panel's notion that the United States as a whole can be characterized as the home forum of all domestic plaintiffs. Moreover, even if Guidi were nominally applicable, it would be inapposite. The location of a plaintiff's home forum has no obvious bearing on the presumptive weight that should be accorded to his forum choice, and the majority has not identified any legitimate reason why the distinction between an alternative domestic forum and an alternative foreign forum should matter in determining, in the typical case, whether a plaintiff is entitled to the usual strong presumption in favor of his choice of forum.
 
 
 126
 The majority also suggests that Wiwa, 226 F.3d 88, dictates that Judge Mukasey should have retained jurisdiction in the instant case. Wiwa, like Guidi, was an atypical case involving the extraordinary situation of Nigerian emigres seeking redress under the Torture Victim Prevention Act, 28 U.S.C. § 1350 App., for the torture they suffered in Nigeria. The majority misreads Wiwa when it suggests that Wiwa creates a rule that when half or more of the plaintiffs to a lawsuit are residents of the United States the district court must retain jurisdiction in the face of a motion to dismiss for forum non conveniens, see ante at 64. In Wiwa we were perfectly clear that the case does not alter the traditional Gilbert factors and plainly "do[es] not reflect a rigid rule of decision protecting U.S. citizen or resident plaintiffs from dismissal for forum non conveniens." Wiwa 226 F.3d at 102. We simply reiterated that "a plaintiff's lawful U.S. residence can be a meaningful factor supporting the plaintiff's choice of a U.S. forum," and that it is one factor that a district court should consider in deciding whether to dismiss a case on forum non conveniens grounds. Id.
 
 
 127
 Although in Wiwa we held that the district court erred in failing to count in favor of the plaintiffs' choice of forum that "two of them were residents of the United States," id. at 103, we also stated clearly that the key question underlying the relevance of that factor is whether a dismissal for forum non conveniens "would cause plaintiff significant hardship." Id. In the instant case, Judge Mukasey explicitly enumerated and considered plaintiffs' claims that this dispute is connected to the United States and, thus, should be litigated in an American forum. See DiRienzo, 49 F. Supp. 2d at 641. After reviewing plaintiffs' claims, Judge Mukasey noted that, from plaintiffs' perspective, some of the connections between the dispute and the United States "will make litigating in Ontario less convenient." Id. Judge Mukasey's analysis makes clear that he considered the burden that moving the litigation to Canada would place on plaintiffs, and that he concluded that something short of "significant hardship"-some mere inconvenience-would result.
 
 
 128
 The majority's conclusion-that, in a typical case, any court of the United States can serve as an American plaintiff's "home forum"-will unduly restrict the broad discretion of a district court that we have understood to exist in these situations. It is clear that forum non conveniens was employed in the past "to force transfer of a case domestically from one state or district to another."[8] Howe, 946 F.2d at 947. For instance, in both Koster and its companion case, Gilbert-which we have long recognized as the "leading authority on forum non conveniens," Alcoa, 654 F.2d at 150-the Supreme Court affirmed forum non conveniens dismissals in favor of other domestic venues.[9] It is therefore clear beyond doubt that the "leading authority on forum non conveniens" did not understand all domestic venues to be created equal, with each of them, or any of them, able to function as the home forum for an American plaintiff.
 
 
 129
 Following the enactment of § 1404(a), courts only look to the federal common law of forum non conveniens in cases involving foreign alternative fora. If Koster is applied improperly-that is, as it is applied by the majority here-the effect of the majority's conclusion that any court of the United States serves as the home forum for a proposed plaintiff class comprised in part of Americans will be quite straightforward: It will prevent district courts from applying the law of forum non conveniens except in cases where the plaintiffs themselves are largely foreign.
 
 
 130
 This newly-contrived, and unnecessary, restriction on the discretion of district courts is at odds with the historical understanding of the idea of a "home forum." In the context of both venue, see generally 15 CHARLES A. WRIGHT &AMP; ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3802 (1986) (detailing the history of venue provisions, including the early requirement that suit be brought "in the district of residence of either the plaintiff or the defendant" (emphasis added)), and personal jurisdiction, see, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 470-78 (1985) (Florida not the home forum of Michigan resident), a party's home forum has always been tied to the district or state in which he resides. This concept is reflected in our own forum non conveniens jurisprudence, as we have explained that the "general rule under [Gilbert] requires a court to defer to a plaintiff's choice of forum unless the forum non conveniens factors strongly favor dismissal, especially where the plaintiff resides in the forum state." Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V., 145 F.3d 505, 510 (2d Cir. 1998) (emphasis added) (citation omitted); see also Gemini Capital Group, Inc. v. Yap Fishing Corp., 150 F.3d 1088, 1091-92 (9th Cir. 1998) (concluding that a California plaintiff was not entitled to a strong presumption in favor of its choice of Hawaii as the forum because Hawaii was not the home forum); but see Reid-Walen v. Hansen, 933 F.2d 1390, 1394 (8th Cir. 1991) (reaching to opposite conclusion). Put another way, we stated in Evolution Online that a plaintiff's forum choice is entitled to more weight when he resides in the forum state, and conversely is entitled to less weight when he resides outside the forum state. The majority offers no comment or explanation for its abandonment of this commonsense conclusion, which is rooted in the generally accepted understanding that a party's home forum is the state or district in which it resides.
 
 
 131
 Finally, even if the majority's narrow interpretation of Koster arguably might have some force in a case where none of the plaintiffs resided in the alternative forum (here, Canada), in the instant case plaintiffs propose to represent "all purchasers" of Philip stock during the relevant period, and it is not disputed that a significant percentage of the proposed class is Canadian.[10] The fact that a significant percentage of the proposed class is situated outside the United States further bolsters Judge Mukasey's reasonable and modest conclusion that plaintiffs' choice of the Southern District of New York as the forum for the DiRienzo representative action is entitled to "less weight" than a plaintiff's choice of forum normally would receive in a direct action. Although the majority claims that plaintiffs want this case tried in New York "not simply because they prefer that location, but because of the substantive benefits they perceive would ensue from trying this case in the United States," ante at 62, we have stated clearly that "the difference in applicable substantive law is properly considered when assessing whether an adequate alternative forum exists," see Alfadda, 159 F.3d at 46, not whether the forum choice is entitled to a strong presumption.[11]
 
 
 132
 In conclusion, the majority's opinion-that any court of the United States can serve as the home forum in any case involving American plaintiffs-appears to rest on a reflexive, chauvinistic preference for American courts and American plaintiffs above all others. Of course, whatever the merit-if any-of this novel stance, which dramatically departs from the federal common law of forum non conveniens as we have known it, this preference properly should be articulated in the first instance by the Supreme Court.
 
 
 133
 For these reasons, I believe that Judge Mukasey properly exercised his conceded discretion in concluding that the DiRienzo plaintiffs' choice of forum in a representative suit is entitled to "less weight" than if they had chosen to file an action only on their own behalf.
 
 III. The Liff Action
 
 134
 The Liff action arises out of many of the same facts alleged in DiRienzo. In August 1998, the Liff plaintiffs filed suit in Tennessee, naming as defendants five of Philip's director-officers.[12] The Liff plaintiffs were stockholders in five corporations that Philip had purchased in exchange for a combination of cash and Philip stock. They claim that, in selling their companies to Philip, they relied on the veracity of statements in Philip's filings with the U.S. Securities and Exchange Commission concerning the company's financial performance, and that these statements turned out to be fraudulent. Each of the fourteen Liff plaintiffs asserts claims solely on his own behalf.
 
 
 135
 On February 3, 1999, the Judicial Panel on Multidistrict Litigation transferred Liff to the Southern District of New York for "coordinated or consolidated pretrial proceedings" with DiRienzo, which already was pending there. On May 26, 1999, the District Court issued a brief Order in Liff, stating that "[f]or the reasons set forth in this Court's May 4, 1999 opinion and order in [DiRienzo] the above-captioned case is dismissed." On June 24, 1999, the Court denied the Liff plaintiffs' motion to amend the judgment pursuant to FED. R. CIV. P. 59, noting that its May 4 Opinion "dismissed all actions herein, including Liff."
 
 
 136
 In dismissing Liff, the District Court relied solely on the "reasons set forth in" its May 4 Opinion. However, the reasons for granting the motion to dismiss DiRienzo, as expressed in the May 4 Opinion, are not entirely applicable to Liff. Specifically, the District Court noted in DiRienzo that it was placing "less weight" on plaintiffs' choice of forum because they were proceeding in a representative capacity. DiRienzo, 49 F. Supp. 2d at 634. While I believe this was a perfectly sound conclusion with respect to DiRienzo, it bears recalling that the Liff plaintiffs are not proceeding in a representative capacity. I believe the Liff plaintiffs, unlike the DiRienzo plaintiffs, are entitled to "a strong presumption in favor of [their] choice of forum." Murray, 81 F.3d at 290. In these circumstances, I would vacate and remand Liff in order to permit the District Court to reconsider whether it should exercise its discretion to dismiss Liff in favor of litigation in Ontario after affording the Liff plaintiffs the benefit of this presumption.
 
 
 
 Notes:
 
 
 [1]
 I primarily address the majority's handling of DiRienzo v. Philip Services Corp., No. 99-7825 ("DiRienzo"), and then turn briefly in Part III to Liff v. Chodos, No. 99-7776 ("Liff").
 
 
 [2]
 Specifically, the District Court noted that "among others," Peter McQuillan, the former Comptroller of the Scrap Metals Division of Philip Services Corp. ("Philip"), and Greg Madesker and Rik Barrese, former traders in Philip's Metals Recovery Division, could not be compelled to testify by an American court. Id. at 640. The Court explained that "[t]he conduct of these parties is central to the allegations in plaintiffs' complaint, and will likely be crucial in resolving the dispute." Id.
 
 
 [3]
 In my view, the District Court's statement that the connection with the United States did not warrant "significant" consideration, DiRienzo, 49 F. Supp. 2d at 642, understates the strong interest our nation surely has in protecting the integrity of its securities markets. Nevertheless, despite this rhetorical flourish, it is apparent that the District Court properly and adequately considered the United States' interest in enforcing its securities laws; this is all that is required of a district court in these circumstances.
 
 
 [4]
 We can be certain that the Alfadda Court was fully aware of the existence of both letters rogatory and the possibility of videotaping when it reiterated just two years ago our preference for live-as opposed to taped-witness testimony.
 
 
 [5]
 Moreover, unlike Koster, not even the lead DiRienzo plaintiffs have alleged that they reside within the district in which they filed suit.
 
 
 [6]
 The instant actions provide a prime example of how the PSLRA has no effect on the right to bring suit, in that the Liff plaintiffs are proceeding with direct claims for securities fraud, and there is no indication that they are somehow "less equal" to proceed than the lead plaintiffs in DiRienzo.
 
 
 [7]
 The only other case addressing the issue in a post-PSLRA setting found that "the strong presumption in favor of the plaintiff's choice of forum . . . . is entitled to less weight where, as here, plaintiffs proceed in a representative capacity." In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 212 (S.D.N.Y. 1999) (citing Koster, 330 U.S. at 524) (internal quotation marks omitted) (emphasis added).
 
 
 [8]
 In 1948, Congress enacted 28 U.S.C. § 1404(a), pursuant to which a court can direct a change of venue from one domestic court to another in the interest of convenience. We have explained that § 1404(a) "codifies a part of the district court's inherent power." Alcoa Steamship Co. v. M/V Nordic Regent, 654 F.2d 147, 156 (2d Cir. 1980) (en banc) (internal quotation marks omitted). Accordingly, in purely domestic cases, courts no longer dismiss on forum non conveniens grounds; instead, courts utilize their statutory authority to transfer venue.
 
 
 [9]
 Specifically, in Gilbert, the Court affirmed the forum non conveniens dismissal of "an action commenced in the Southern District of New York by a Virginia plaintiff against a Pennsylvania corporation to recover damages caused by a fire in a warehouse in Lynchburg, Virginia." Gilbert, 330 U.S. at 509. In doing so, the Court made it clear that New York was not the home forum of the Virginia plaintiff. See id. Similarly, in the companion case of Koster, the Court affirmed the forum non conveniens dismissal of an action brought in New York against Illinois defendants on behalf of a nationwide class. Had New York served as a home forum for the entire class, rather than just the lead plaintiff, presumably Mr. Koster would have been entitled to a strong presumption in favor of his choice of forum; instead, the Court denied him the benefit of the strong presumption and held that the action was more properly brought in Illinois.
 
 
 [10]
 As noted above, of the $380 million raised by Philip in a November 1997 secondary offering, approximately $94 million was derived from sales by Canadian underwriters to investors outside the United States.
 
 
 [11]
 We have explained: "That the law of the foreign forum differs from American law 'should ordinarily not be given conclusive or even substantial weight' in assessing the adequacy of the forum." Alfadda, 159 F.3d at 46 (quoting Piper Aircraft, 454 U.S. at 247). Accordingly, the majority's concern over "the applicable rules of law" is largely irrelevant even with regard to the adequacy of the alternative forum, and certainly should play no role in determining whether plaintiffs' forum choice should be afforded substantial deference.
 
 
 [12]
 Each of the Liff defendants, save Peter Chodos, also is a defendant in DiRienzo.