CROMER FINANCE LTD. and Prival N.V., et al., Plaintiff,

v.

Michael BERGER, Fund Administration Services (Bermuda) Ltd., Ernst & Young International, Ernst & Young Bermuda, Kempe & Whittle Associates Limited, Deloitte & Touche (Bermuda), Deloitte Touche Tohmatsu, Deloitte & Touche L.L.P., Bear Stearns & Co., Inc., Bear Stearns Securities Corp., Financial Asset Management, Inc., and John Does 1–100, Defendants.

Argos et al., Plaintiffs,

v.

Michael Berger, Financial Asset Management, Inc., Fund Administration Services (Bermuda) Ltd., Ernst & Young International, Deloitte Touche, Deloitte Touche Tohmatsu, Deloitte & Touche L.L.P., Bear Stearns & Co., Inc., and Bear Stearns Securities Corp., Defendants.

No. 00 CIV. 2284(DLC), 00 CIV. 2498(DLC).

United States District Court, S.D. New York.

Aug. 16, 2001.

Steven S. Honigman, Richard P. Swanson, Jonathan E. Polonsky, Veronica E. Rendon, Thelen Reid & Priest LLP, New York, NY, Jeffrey H. Squire, Richard L. Stone, Mark A. Strauss, Kirby, McInerney & Squire, LLP, New York, NY, for Plaintiffs Cromer et al.

Steven E. Greenbaum, Scott M. Berman, Berlack, Israels & Liberman LLP, New York, NY, for Plaintiffs Argos et al.

Michael J. Dell, Timothy J. Helwick, Yehudis Lewis, Kramer Levin Naftalis & Frankel LLP, New York, NY, for defendant Deloitte Touche Bermuda.

Robert E. Juceam, Gregg L. Weiner, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, for defendants Ernst & Young Bermuda, Fund Administration Services (Bermuda) Ltd., and Kempe & Whittle Associates Limited.

Martin I. Kaminsky, Edward T. McDermott, Pollack & Kaminsky, New York, NY, for defendant Financial Asset Management, Inc.

Michael Berger, West Hampton Beach, NY, pro se.

## OPINION & ORDER

COTE, District Judge.

Four accounting firms based in Bermuda have moved to dismiss these federal securities actions on the ground of *forum non conveniens*. The plaintiffs in the *Cromer* class action and in the *Argos* joinder action [1] were investors in the Manhattan Investment Fund, Ltd. ("Fund"), an off-shore investment fund established under the laws of the British Virgin Islands, but managed from New York by defendant Michael Berger ("Berger"). Berger is an Austrian citizen who lives in New York. The Fund traded United States securities and the plaintiffs allege enormous losses based on Berger's fraudulent management of the Fund.

Three of the four Bermuda accounting firms that have filed this motion—Ernst & Young Bermuda ("EYB"), Fund Administration Services (Bermuda) Ltd. ("FASB"), and Kempe & Whittle Associates Limited ("K & W") (collectively, the "Ernst & Young Defendants")—served as the

---

1. Plaintiffs in the *Argos* action are 28 Fund shareholders, each of whom invested between $400,000 and $16,000,000 in the Fund.

Fund's administrators[2]; the fourth—Deloitte Touche Bermuda ("DTB")—served as the Fund's auditor. The plaintiffs allege that the monthly Net Asset Value ("NAV") statements prepared and distributed by the Ernst & Young Defendants and the annual audit reports prepared by DTB and distributed by the Ernst & Young Defendants contained false statements in that they described the Fund—which had principally utilized a trading strategy of concentrated short selling of United States technology stocks—as profitable although it was, in fact, losing money from its inception. In preparing their reports, the Bermuda defendants used fictitious statements Berger created in New York on the letterhead of another defendant—Financial Asset Management, Inc. ("FAM")—a United States broker with its principal place of business in Ohio but with an office in New York.

When the plaintiffs filed these actions they named as defendants not only the four Bermuda accounting firms, Berger, and FAM, but also defendants who were dismissed through an Opinion and Order of April 17, 2001 ("April 17 Opinion"). *Cromer Finance Ltd. v. Berger*, 137 F.Supp.2d 452 (S.D.N.Y.2001). Familiarity with the April 17 Opinion is assumed, and defined terms have the meanings given them there.[3] The dismissed defendants included Bear Stearns, which is a broker located in New York that acted as a clearing broker for the Fund's trading activity and that held the Fund's assets in its custody, and United States and international affiliates of the four Bermuda entities. These affiliates had their principal offices in New York.[4] In brief, the claims against the affiliates were dismissed because the Court rejected the many theories of derivative liability alleged against them for the alleged wrongdoing by Berger and the Bermuda defendants. The claims against Bear Stearns were dismissed for failure to allege that it "substantially assisted" the fraud, an essential element of the common law theories of liability asserted in the complaints.

Of the six remaining defendants, only the four Bermuda entities are actively defending the claims. The two American defendants—Berger and FAM—are either subject to or have consented to the jurisdiction of Bermuda and support the dismissal of this action on the ground of *forum non conveniens*.

The Fund was designed for foreign investors and United States tax-exempt investors such as pension funds and trusts. While the Ernst & Young Defendants ac-

---

**2.** K & W served as the administrator between September 1995 and September 1997, when it was replaced by FASB. The plaintiffs have alleged that EYB's intertwined relationship with FASB and K & W and its control of those entities meant that it had its own significant and direct involvement with the Fund although it was not separately named as the Fund's administrator.

**3.** The Court subsequently denied the motions for reconsideration brought by the four Bermuda accounting firms. *Cromer Finance Ltd. v. Berger*, Nos. 00 Civ. 2284, 00 Civ. 2498(DLC), 2001 WL 506908 (S.D.N.Y. May 14, 2001).

**4.** The affiliates included Ernst & Young International ("EYI"), which organizes the Ernst & Young enterprise from its executive offices in New York through, among other things, the Articles of Association that provide for "coordination and facilitation of the development of global strategies and initiatives ... [and] of investments and resources allocation." Deloitte Touche Tohmatsu ("DTT"), operating as a Swiss Verein, is the equivalent of EYI for the Deloitte & Touche enterprise. DTT's "Articles of the Verein" detail the Verein's purposes, including, among other things, to "further international alignment, cooperation, and cohesion among the Member Firms." Deloitte & Touche LLP ("DTUS") is a New York-based Member Firm of DTT.

tively solicited United States investors with mailings to the United States, for purposes of this motion it is assumed that all of the investors are foreign.[5] Nevertheless, there were regular mailings by the Ernst & Young Defendants to Fund investors at United States addresses, and it appears that investment managers of investors, if not investors themselves, were located in New York and in other cities in the United States.

The investors in the Fund came from many foreign countries, including countries in Europe and in the Caribbean. The named plaintiffs in the *Cromer* action are domiciled in the British Virgin Islands and the Netherlands Antilles. The majority of plaintiffs in the *Argos* action are European entities or citizens, but also include companies from the Cayman Islands, Bahamas, or the British Virgin Islands (three of whom have offices in Bermuda), and a Panamian company. The plaintiffs urge this Court to retain jurisdiction because the United States, and New York in particular, is the one venue in the world with the strongest connection to the fraud and is the most convenient forum for the widely dispersed plaintiffs. They argue that any claims of inconvenience by the Bermuda defendants must be discounted because these defendants regularly operate in the international arena and obtained their assignments for this Fund by applying directly to Berger in New York and by touting their affiliation with international Ernst & Young or Deloitte & Touche entities.

The four Bermuda defendants emphasize that they are small entities with offices solely in Bermuda, that Bermuda has a strong interest in enforcing compliance by its own accounting firms with the professional and legal prohibitions against fraud and negligence, and that the plaintiffs have no connection with the United States since they are all foreign. They also point out that the discovery and litigation over jurisdiction would be eliminated if the cases were prosecuted in Bermuda. With this overview, an application of the law of *forum non conveniens* follows.

## DISCUSSION

■ The doctrine of *forum non conveniens* permits a court in "rare instances to 'dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim,'" *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000) (citation omitted), if dismissal would "best serve the convenience of the parties and the ends of justice," *Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). Dismissal is appropriate "where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, or where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (applying doctrine in case with Scottish plaintiffs); *see also Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Iragorri v. International Elevator, Inc.*, 243 F.3d 678, 680 (2d Cir.2001). "Because much of the doctrine's strength derives from its flexibility and each case turns on its own facts, a single factor is rarely dispositive."

**5.** The parties hotly contest whether there are any United States investors. There is evidence that twenty-one entities received NAV statements in the United States, and ten entities with United States addresses appear on the investor list filed with the Southern District Bankruptcy Court. The parties have been engaged in discovery to determine whether any of the beneficial owners or record holders of the Fund's securities are American citizens or residents.

*DiRienzo v. Philip Serv. Corp.,* 232 F.3d 49, 57 (2d Cir.2000) (citing *Piper Aircraft,* 454 U.S. at 249–50, 102 S.Ct. 252).

■ A district court follows two steps when considering a *forum non conveniens* motion:

> First, the district court must decide whether an adequate alternative forum exists, and if so, the district court must apply a presumption in favor of the plaintiff's choice of forum and then weigh a variety of factors [articulated in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) ] relating to the private interests of the litigants and the public interest in order to determine whether that presumption is overcome and ultimately which forum is more convenient.

*Iragorri,* 243 F.3d at 680 (citing, *inter alia, Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839). The burden of proof is on the defendant. *Wiwa,* 226 F.3d at 100.

## I. Adequate Alternative Forum

■ An alternative forum is generally adequate provided that the defendant may be served there. *DiRienzo,* 232 F.3d at 57. On "rare occasions," the available remedies in an alternative forum "may be so unsatisfactory that the forum is inadequate." *Id.* The forum is not inadequate, however, by the "mere fact that the foreign and home fora have different laws," and " 'dismissal may not be barred solely because of the possibility of an unfavorable change in law.' " *Id.* (citing *Piper Aircraft,* 454 U.S. at 249, 102 S.Ct. 252); *see also Capital Currency Exchange, N.V. v. National Westminster Bank PLC,* 155 F.3d 603, 609–10 (2d Cir.1998) (same). Rather, the Second Circuit has held

> Even if particular causes of action or certain desirable remedies are not available in the foreign forum, that forum will usually be adequate so long as it permits litigation of the subject matter of the dispute, provides adequate procedural safeguards and the remedy available in the alternative forum is not so inadequate as to amount to no remedy at all.

*DiRienzo,* 232 F.3d at 57 (citing *Piper Aircraft,* 454 U.S. at 254–55, 102 S.Ct. 252) (emphasis supplied). Where the remedy provided by the foreign forum, however, is "so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight" and the district court may refuse to dismiss based on the "interests of justice." *Piper Aircraft,* 454 U.S. at 254, 102 S.Ct. 252.

Plaintiffs do not contest that the defendants remaining in this action are either subject to or have consented to jurisdiction in Bermuda, nor do they argue that Bermuda fails to permit litigation of the subject matter of the dispute or to provide adequate procedural safeguards. The sole objection plaintiffs make to Bermuda's adequacy is that EYB's Bermuda counsel has asserted that the Fund is subject to the Companies Act under Bermuda law. Section 90(3A) of that Act provides that no action lies against an auditor in the performance of its functions except where brought by the company hiring the auditor or "any other person expressly authorized by the auditor to rely on his work." Since DTB has explicitly rejected reliance on Section 90(3A) and has acknowledged that it is not applicable here, there is no basis for dispute that Bermuda is an adequate alternative forum.

## II. Deference Accorded to Plaintiffs' Choice of Forum

■ It is well settled that every plaintiff's selection of forum receives deference, although the degree of deference "increases as the plaintiff's ties to the forum in-

crease." *Wiwa,* 226 F.3d at 101. Where a plaintiff has chosen to litigate in his home forum, that choice is "entitled to greater deference" because it is "reasonable to assume that this choice is convenient." *Piper Aircraft,* 454 U.S. at 255–56, 102 S.Ct. 252; *see also Guidi v. Inter–Continental Hotels Corp.,* 224 F.3d 142, 146 (2d Cir. 2000). In contrast, where the plaintiff is foreign, the strong presumption that "ordinarily" applies to a plaintiff's choice of forum, "is much less reasonable." *Piper Aircraft,* 454 U.S. at 256, 102 S.Ct. 252; *see also Wiwa,* 226 F.3d at 103. Consequently, when the real parties in interest are foreign, "the presumption in favor of the [plaintiff's] forum choice applie[s] with less than maximum force." *Piper Aircraft,* 454 U.S. at 261, 102 S.Ct. 252. This does not mean, however that dismissal is "automatically barred" when a plaintiff has chosen his home forum, *id.* at 255 n. 23, 102 S.Ct. 252, nor that dismissal is automatically mandated when a foreign plaintiff is involved. Rather, "some weight" must be given to the foreign plaintiff's forum choice, and " 'this reduced weight is not an invitation to accord a foreign plaintiff's selection of an American forum *no* deference since dismissal for *forum non conveniens* is the exception rather than the rule.' " *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 290 (2d Cir.1996) (citation omitted) (emphasis in original). As the Supreme Court noted in *Gilbert,* in which it applied the doctrine in a case with a "foreign" plaintiff, "the plaintiff's choice of forum should rarely be disturbed." *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839 (Virginia plaintiff filed action in New York).

■ The Bermuda defendants emphasize that the plaintiffs in both cases are sophisticated non-American institutions with no ties to the United States and that they invested off-shore in an attempt to avoid American tax liability. They argue that none of the class members in the *Cromer* action or plaintiffs in the *Argos* action could have had any reasonable expectation of being able to sue the Bermuda defendants in the United States when they made their investments. The Offer Memo advertising the Fund stated that the Fund was a British Virgin Islands Fund with Bermuda auditors and administrators. Each plaintiff sent its subscription documents to Bermuda and represented and warranted when investing in the Fund that it was not acquiring shares in the United States.

To the extent that this argument is an attempt to reargue for a second time the Court's finding in the April 17 Opinion that there is personal jurisdiction over the Bermuda defendants, it can be swiftly rejected. There is no basis presented in these papers to reevaluate the preliminary determination made in that Opinion that there is either general jurisdiction over these defendants based on their continuous and systematic general business contacts with the United States, or specific jurisdiction based on their purposeful activities directed at the residents of the United States in connection with their work on the Fund, or both, and that it is reasonable under the Due Process Clause to exercise this jurisdiction. Moreover, from the perspective of the investors, each investor was advised from the outset of significant connections between the Fund and the United States. The Offer Memo indicates that the Fund's shares are to be purchased in United States currency, that the Fund will engage in trading of United States securities, and that the Fund is managed by Berger, "the sole shareholder of Manhattan Capital Management, Inc.," identified as "a Delaware Corporation." [6]

---

**6.** The defendants argue that no deference to plaintiffs' choice should be given in the *Crom-*

Even acknowledging that the *Argos* plaintiffs are entirely non-American and assuming for the purposes of this Opinion that the *Cromer* action includes no American-resident plaintiffs,[7] the Court still accords some deference to their choice of forum. The level of deference, however, will be considerably less than that which applies when there are domestic plaintiffs.[8]

## III. *Gilbert* Factors

### A. Public Factors

■ In weighing a motion to dismiss on grounds of *forum non conveniens*, courts consider several public factors, including "[1] administrative difficulties associated with court congestion; [2] the local interest in having controversies decided at home; [3] the interest in having the trial in a forum that is familiar with the law governing the action; [4] the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and [5] the unfairness of burdening citizens in an unrelated forum with jury duty." *Murray*, 81 F.3d at 292 (citing *Piper Aircraft*, 454 U.S. at 241 n. 6, 102 S.Ct. 252); *see also DiRienzo*, 232 F.3d at 63 (citing *Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839).

### 1. Administrative Difficulties

■ The Ernst & Young Defendants argue for transfer to Bermuda based on the congested docket in the Southern District of New York in comparison to that of Bermuda. The Ernst & Young Defendants' legal expert asserts that the action could be heard and determined within about two years of a writ being filed in Bermuda. Plaintiffs' expert counters that significant delays may result because of a shortage of judges, courtroom space, and the frequency of interlocutory appeal in Bermuda.

The defendants' argument is unpersuasive. While the docket of the Southern District is an active one, courts in this district have shown themselves more than able to address the issues that arise in complex actions in an expeditious and comprehensive manner. This Court has already digested a lengthy and complicated record. In addition to a multitude of telephone and court conferences on discovery and other issues, the Court has issued an extensive opinion on motions to dismiss brought concurrently by nine of the original defendants, as well as a ruling on the motions for reconsideration brought by four of those defendants. Document discovery is essentially complete and the parties are poised to begin depositions as soon as the Court lifts the stay it recently imposed in response to the joint application

---

*er* action since they were solicited by American attorneys in Europe. That argument, however, ignores the numerous reasons for filing this litigation in New York. If the thrust of this argument is to underscore that the plaintiffs are foreign, then that fact has been acknowledged by the diminished weight accorded here to plaintiffs' forum selection. If this argument seeks instead to cast a pall over the legitimacy of the plaintiffs' claims, even in the face of the plaintiffs' substantial losses and the undisputed evidence of Berger's fraud, that issue will be addressed when these causes of action are ripe to be considered on the merits.

**7.** The *DiRienzo* Court looked to the residence of all of the members of an uncertified class in its deference analysis. *DiRienzo*, 232 F.3d at 62.

**8.** Relying on *Koster v. American Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), the defendants also argue that the presumption in favor of the plaintiffs' forum is weakened in the *Cromer* action because it is a class action. This Court will apply a substantially reduced level of deference in any event due to the fact that the plaintiffs are assumed to be entirely foreign.

by the Bermuda defendants.[9] Even if a Bermuda court were able to dispose of this action within two years, it would still constitute a material delay in the course of this litigation.

### 2. Local Interest

■ The Bermuda defendants argue that the core of the remaining litigation is their alleged wrongdoing, all of which occurred in Bermuda, and that Bermuda therefore has the most significant interest in trying this case as do these defendants in vindicating their reputations in Bermuda. There is no doubt that Bermuda has a significant interest in trying a case where wrongdoing is alleged against Bermuda-based entities, and even more so when the work was done, as was true here, in connection with a fund which was licensed to do business as a permit company in Bermuda. The Supreme Court, however, has rejected the contention that where a trial involves " 'inquiry into the internal affairs of a foreign corporation,' " dismissal is always mandated. Rather, that is " 'one, but only one, factor which may show convenience.' " *Piper Aircraft*, 454 U.S. at 262–63, 102 S.Ct. 252 (quoting *Koster*, 330 U.S. at 527, 67 S.Ct. 828). While the defendants clearly have an interest in vindicating themselves in their local community, *Mobil Sales and Supply Corp. v. Republic of Lithuania*, No. 97 Civ. 4045(DLC), 1998 WL 196194, at *9 (S.D.N.Y. Apr.23, 1998), they disregard their activity in New York and underestimate New York's own significant and comparable interest in trying this action.

To begin with, while not determinative, United States courts have an interest in enforcing United States securities laws. *Alfadda v. Fenn*, 159 F.3d 41, 47 (2d Cir. 1998) New York's own interest in this litigation, however, extends far beyond the application of United States securities laws to fraud. The fraud alleged by the plaintiffs, and to which Berger has entered a plea of guilty in the Southern District of New York, was orchestrated from New York. Both DTB and the Ernst & Young Defendants, although admittedly based in Bermuda, won the right to work for the Fund by directly contracting to do so with Berger. EYB personnel made at least 4 trips to New York for substantive discussions with Berger regarding their engagement. Each of the Bermuda defendants touted their membership in international business networks run from the United States to win their right to work for a Fund centrally managed from the United States and open to certain classes of American investors. The Ernst & Young Defendants consistently took direction from the New York investment manager and all of the Bermuda defendants based their work on financial information emanating from that investment manager. DTB represented to the investors that its work was performed in accordance with United States accounting principles.

This case is readily distinguishable from those securities actions which have been dismissed on the ground of *forum non conveniens*. For example, in *Alfadda v. Fenn*, 159 F.3d 41 (2d Cir.1998), the operations of the company at issue were "indisputably based in France." *Id.* at 43. In *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996 (2d Cir.1993), the action centered on the liquidation of Australian corporations involving fraud by Australian corporations and Australian and New Zealand banks in Australia. *Id.* at 996. Fi-

---

**9.** On August 2, 2001, the Court suspended discovery at the request of the Ernst & Young Defendants and DTB so that the remaining discovery can be informed by the opinions which will be issued on their second round of motions to dismiss, and on the motion for class certification in the *Cromer* action.

nally, in *Diatronics, Inc. v. Elbit Computers, Ltd.*, 649 F.Supp. 122 (S.D.N.Y.1986), "[a]lmost every significant event concerning the pertinent transaction took place in Israel." *Id.* at 128.

On balance, therefore, both Bermuda and the United States have strong interests in the litigation of the legality of the conduct in which the Bermuda defendants engaged. The United States has a stronger interest, however, in addressing all of the factual issues implicated by this litigation, including the conduct of the remaining American-resident defendants, Berger and FAM. Having aggressively relied upon their ability to perform work for a United States-managed Fund and to operate in the international arena, neither DTB nor the Ernst & Young Defendants can persuasively argue once those representations have won them the right to perform that work and after litigation develops from that assignment, that their work had significance only in Bermuda.

*3. Forum Familiar with Governing Law & Avoiding Conflict of Laws Problems*

■ While the *forum non conveniens* test analyzes the extent to which a forum would be forced to apply foreign law, the "need to apply foreign law ... alone is not sufficient to warrant dismissal". *Piper Aircraft*, 454 U.S. at 260 n. 29, 102 S.Ct. 252; *see also Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 492 (2d Cir.1998); *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 47 (2d Cir.1996). In this case New York law will apply to the plaintiffs' tort claims. If the investors brought actions in Bermuda, Bermuda courts would have to apply U.S. GAAP and GAAS principles since the DTB audits were performed under those principles.

■ In the first round of motions to dismiss filed by the defendants, only DTB argued that Bermuda law applied to any of the plaintiffs' claims, specifically, the claims of aiding and abetting common law fraud and gross negligence, which DTB argued Bermuda did not recognize as causes of action. The April 17 Opinion compared the laws of New York and Bermuda and concluded that plaintiffs' common law fraud claim would not survive in Bermuda without an allegation that DTB had conspired with Berger, an allegation missing from the complaints here. After a choice of law analysis, the Court determined that New York law would apply to both claims. *Cromer*, 137 F.Supp.2d at 491–93. In so doing, it laid out the principles of New York choice of law analysis for tort claims. Specifically,

> New York law employs an "interest analysis" in choice of law analysis of tort claims, under which courts apply "the law of the jurisdiction having the greatest interest in the litigation." *Curley*, 153 F.3d at 12 (applying New York law). The significant contacts are generally the parties' domiciles and the locus of the tort. *Id.* In particular, for claims based on fraud, a court's "paramount" concern is the locus of the fraud, that is, " 'the place where the injury was inflicted,' as opposed to the place where the fraudulent act originated." *Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146, 1150 (S.D.N.Y.1989) (citing *Sack v. Low*, 478 F.2d 360, 365–66 (2d Cir.1973) (interpreting New York law)). The place in which the injury is deemed to have occurred "is usually where the plaintiff is located." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Limited*, 85 F.Supp.2d 282, 292 (S.D.N.Y.2000) (citation omitted).

*Id.* at 492.

DTB now argues that the Court has yet to consider that three of the *Argos* plaintiffs from the British Virgin Islands had

offices in Bermuda. That fact is not sufficient to alter the Court's analysis in the April 17 Opinion on the choice of law issue. *See id.* at 491–93; *Cromer Finance Ltd. v. Berger,* Nos. 00 Civ. 2284, 00 Civ. 2498(DLC), 2001 WL 506908, at *7–8 (S.D.N.Y. May 14, 2001). While the plaintiffs' location is the primary consideration in the analysis, it remains true that the investors here reside in many countries. At this point in time, based on the presently available information, the existence of three offices for *Argos* plaintiffs in Bermuda does not alter the choice of law analysis already made in this case.

■■■ Finally, the Ernst & Young Defendants argue that the Service Agreements that FASB and K & W signed with Berger provided that Bermuda law would apply to disputes arising under the agreements. Those agreements, however, concerned disputes between the Ernst & Young Defendants and the Fund, not between the Ernst & Young Defendants and the investors. Further, in applying New York law, a choice of law provision "indicating that the *contract* will be governed by a certain body of law does not dispositively determine that law which will govern a claim of *fraud* arising incident to the contract." *Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir.1996) (emphasis in original); *see also SEC v. Credit Bancorp, Ltd.,* 147 F.Supp.2d 238, 251–52 (S.D.N.Y.2001). Rather, " 'a contractual choice of law provision governs only a cause of action sounding in contract.' " *Krock,* 97 F.3d at 645 (citation omitted).

*4. Jury Duty Imposed on Community with No Relation to Controversy*

As discussed above, because both Bermuda and New York have an interest in

this litigation, there is little concern with inappropriately burdening jurors with service in either forum, at least so long as the claims at trial concern the Bermuda defendants.[10] It is not altogether certain, however, that Bermuda would provide a trial by jury in this case. In any event, and on balance, neither forum is favored by this factor. *See Capital Currency,* 155 F.3d at 611.

In sum, the public factors do not support dismissal. They are either in equipoise or favor the plaintiffs.

**B. Private Factors**

■■■ Courts consider several private factors in assessing *forum non conveniens* motions, including "(1) ease of access to evidence; (2) the availability of compulsory process to compel the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; ... and [4] all other factors that might make the trial quicker or less expensive." *DiRienzo,* 232 F.3d at 66.[11]

*1. Access to Evidence*

■■■ The defendants argue that, because they performed their auditing and administrative work in Bermuda, the majority of the relevant documents are in Bermuda while the plaintiffs' documents are in neither the United States nor Bermuda. To the extent that they have sought to subpoena documents from investors, advisors or managers in the United States, the defendants argue that this is jurisdictional discovery which becomes irrelevant if the case is dismissed to Bermu-

---

**10.** Should the claims against Berger and FAM be the only claims to be tried in Bermuda, it would make little sense to impose the duty of jury service in such a trial on the Bermudese.

**11.** No party argues that another factor—the possibility of a view of the premises—is relevant to this action.

da where there is no dispute regarding personal or subject matter jurisdiction.

It appears that all of the relevant documents once in Bermuda are already in New York: the records of the Ernst & Young Defendants have already been turned over to the Fund's Trustee in New York as well as to the SEC, and DTB has sent its audit papers to DTT in New York. The plaintiffs either have or are in the process of receiving these documents. Consequently, no relevant documents should exist as of today solely in Bermuda. In addition, there are important documents for this action located in New York, most prominently, the Bear Stearns' records which are essential to proof of the actual investments and losses here. Finally, the records of both FAM and Berger, located in Ohio and New York, will also be important to proving the claims made by the plaintiffs. This factor favors the plaintiffs.

### 2. Availability of Compulsory Process

The availability of compulsory process is significant, particularly where plaintiffs have alleged fraud, since "live testimony of key witnesses is necessary so that the trier of fact can access the witnesses' demeanor" *Allstate,* 994 F.2d at 1001. While parties are not required to submit detailed affidavits identifying witnesses they would call, they "must provide enough information to enable the District Court to balance the parties' interests." *Piper Aircraft,* 454 U.S. at 258, 102 S.Ct. 252.

■ The Ernst & Young Defendants indicate that ten individuals did work for the Fund and that three of these ten are former employees who remain in Bermuda: Tanya Copeland, Simon Turner and John Beck. They do not identify the role played by these three individuals in Fund administration, but two of them appear to have played a significant role since the plaintiffs took the deposition of one of them during the discovery conducted in connection with the defendants' motions to dismiss based on a lack of jurisdiction and are obtaining a letter rogatory for the testimony of the other. The Ernst & Young Defendants also identify the Fund's Bermuda bank (in which investor funds were first deposited before transfer to Bear Stearns) and its first auditors (Arthur Morris Christensen) as Bermuda witnesses.

DTB indicates that eleven employees "participated" in the audits and that two of these eleven are former employees who live in Bermuda. It has, however, provided neither their names nor their roles in the services provided by DTB for the Fund. One of these two employees appears to have important information, however, since the plaintiffs are seeking her testimony through a letter rogatory.[12] DTB also lists the Fund's Bermuda bank. It does not list the auditor it replaced. Since the Fund began trading activity in 1996, and DTB preformed the 1996 audit, it is not clear that its predecessor has any relevant evidence. Certainly, the Ernst & Young Defendants do not explain the relevance of any testimony from it.

Many of the defendants' former employees who worked on Fund business are no longer in Bermuda. It appears that four of the ten Ernst & Young employees who worked on Fund administration have left Bermuda, as have five of the eleven DTB employees who worked on the audits. Of the five letters rogatory submitted by the plaintiffs for former employees of the

---

**12.** Plaintiffs identify Amanda Forbes as a resident of England in their briefs on this motion. In their more recent application for a letter

rogatory, however, they identify Bermuda as the location of her residence.

Ernst & Young Defendants and DTB, two of these apparently significant witnesses currently reside in Bermuda; three live outside.

Plaintiffs have identified a greater number of individuals in New York—principally employees of the defendants dismissed through the April 17 Opinion—who would not be subject to compulsory service in Bermuda. Bear Stearns' employees appear to be relevant not only because of their knowledge of the actual trading losses, and the dissemination of the accurate account statements for the Fund's trading which the plaintiffs allege the Bermuda defendants ignored, but also because of warnings they gave to DTB's American affiliate, which the plaintiffs allege were transmitted to DTB and ignored. Similarly, the person at DTB's American affiliate who is alleged to have transmitted the warning to DTB appears to be an important witness. The employees apparently resident in New York of the American and international affiliates of the Ernst & Young Defendants include individuals with knowledge of the background checks done on the Fund and of discussions with EYB personnel regarding rumors concerning the Fund. As a result, this factor favors neither forum.[13]

### 3. Cost of Willing Witnesses' Attendance

DTB has identified four current employees of the eleven who once worked on the audits. The Ernst & Young Defendants have identified three current employees of the ten who worked on Fund administration. The defendants argue that their key witnesses are located in Bermuda while the plaintiffs are located outside of the United States, including in the British Virgin Islands.

New York and Bermuda are less than 1000 miles apart and no more than two or three hours by direct flight. There are four flights per day between Bermuda and the New York metropolitan area. There is no serious inconvenience for any Bermuda witness to travel to New York for the trial. See DiRienzo, 232 F.3d at 66 (finding "not burdensome by modern standards" travel between Toronto and New York by a direct 90–minute flight); see also Calavo Growers of California v. Generali Belgium, 632 F.2d 963, 969 (2d Cir.1980) ("A forum is not necessarily inconvenient because of its distance from pertinent parties or places if it is readily accessible in a few hours of air travel. It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit.") (Newman, J., concurring).

With respect to the plaintiffs and foreign witnesses who do not reside in either the United States or Bermuda—including the five former employees of DTB and the four former employees of the Ernst & Young Defendants who worked on the audits or Fund administration—travel to New York is far easier than travel to Bermuda. For instance, there are no commercial flights between Bermuda and any other Caribbean island, and there are at most six scheduled commercial flights between London and Bermuda each week. Canada is the only country besides the United States with daily flights directly to Bermuda, and New York City, Newark, and Boston are the only cities with more than one daily flight to Bermuda. This factor favors the plaintiffs.

---

**13.** The parties debate the relative access to Berger's testimony once he is a sentenced prisoner. Because Berger has recently filed a motion to withdraw his plea of guilty, and it is difficult to predict whether Berger will ever cooperate and provide testimony, the Court has not weighed his availability.

#### 4. Other Factors Making Trial Quicker or Less Expensive

 The primary thrust of the argument regarding convenience made by both DTB and the Ernst & Young Defendants is not addressed to any one of these enumerated factors, but is instead a forceful reminder that they are small, independent Bermuda-based entities. They emphasize their identity as *Bermuda* accounting firms because of the recitation in the April 17 Opinion—in the context of motions claiming the absence of personal jurisdiction over them—of facts demonstrating the intertwined nature of their relationship with their American and international affiliates and the importance of United States work to their overall business.

DTB emphasizes that it is a partnership separate and independent from the Deloitte Touche Tohmatsu Verein ("DTT Verein") to which it belongs and that it is owned by its own partners in Bermuda. DTB argues repeatedly that the Court's findings regarding DTB's integration with the DTT Verein—which is run from DTT's offices in New York—are merely *"prima facie"* and not entitled to any deference in this motion practice.

While it is true that the standard applied in the April 17 Opinion, which followed discovery taken by plaintiffs on the Bermuda defendants' jurisdictional defenses, required the plaintiffs to make only a *prima facie* showing of jurisdiction, many of the facts recited there were then and remain now undisputed. The undisputed facts came from documents or from statements made by the Bermuda defendants. For example, DTB advertised itself to Berger as a part of the DTT international network and as having an expertise in United States investment issues. Attached to its March 1997 solicitation letter is a description of DTB as

part of Deloitte Touche Tohmatsu International, which has 4,600 partners and a total of 56,600 professionals serving clients from 686 offices in 123 countries around the world.

> Our Investment Companies Industry group in Bermuda is lead by Bill Jack, who regularly attends conferences and is in constant contact with our network of Investment Company specialists in the U.S. to ensure that we are abreast of current developments in the industry.

Underscoring the significance of this link to its international governing body, DTB prominently affixed the name and logo of DTT to every audit report it issued for the Fund. As explained in the April 17 Opinion, while it is true that Bermuda has an interest in regulating the conduct of DTB,

> New York also has a strong interest in regulating the conduct of an entity which relies in its marketing and in the performance of its work on the implicit representation that it has conformed its conduct to the standards set in New York at the executive offices of the Verein.

*Cromer,* 137 F.Supp.2d at 493.

The Ernst & Young Defendants, while arguing that they are each independent Bermuda entities, do not contest their membership in the Ernst & Young International ("EYI") enterprise. While the Ernst & Young Defendants emphasize the voluntary nature of the EYI organization, arguing that one can "withdraw at any time," the benefits derived from membership have been sufficient for these defendants to remain members. As described in the April 17 Opinion, these defendants rely every day on their integration with EYI, which is in turn managed from its headquarters in New York, to attract international business and to provide the resources necessary to perform that international work. They relied specifically on

their "affiliation with [the] Ernst & Young international network" in soliciting Berger for the opportunity to be the Fund's administrators.

It is not a coincidence that these defendants use the names of internationally famous accounting firms as their own. They have contracted for the right to do so because it gives them access to international work for which they otherwise would never have an opportunity to compete. Consequently, while it is important to weigh from every relevant perspective the burden on the Bermuda defendants of litigation in New York as opposed to in their own home, any fair evaluation of the extent of that burden must also take into account that these defendants expressed no reluctance to perform work emanating from the United States, or to travel to the United States, when seeking employment by the Fund. In short, they expressed a desire to perform on a global stage when it was in their interest to do so.

Defendants raise three additional arguments in favor of dismissal. First, they argue that the dispute over personal and subject matter jurisdiction and the attendant costs of discovery and legal briefing would disappear if the case were dismissed to Bermuda where none of the defendants challenges jurisdiction.[14] This is certainly true. If the case were dismissed from New York, however, the procedural mechanisms of joinder and class certification available in New York may be unavailable[15] and the individual plaintiffs might very well decide to bring separate suits in Bermuda or perhaps across the world. Multiplicitous global litigation or even a multiplicity of separately filed actions in Bermuda would exponentially increase the cost and burden on all of the parties. Thus, both New York and Bermuda have offsetting costs and burdens in these regards.

The defendants also argue that other proceedings are pending in Bermuda, namely the liquidation of the Fund and individual proprietary claims[16] by fifteen shareholders against FASB as well as Berger, the Fund, Bank of Bermuda, and possibly others, making it more convenient for them to litigate these actions in Bermuda as well. Notably, however, these fifteen shareholders have not sued DTB, K & W or EYB in Bermuda, while there is currently an action pending in New York State Supreme Court against each of them. None of the investors covered by the *Argos* or *Cromer* actions have filed suit in Bermuda. Beyond that, the United States Government is actively litigating the Fund's fraudulent activity. The SEC filed suit against the Fund and Berger in the Southern District of New York and the United States Attorney's Office for the Southern District of New York indicted Berger, who entered a plea of guilty on November 27, 2000. Finally, the Bankruptcy Court for the Southern District of

---

**14.** The Bermuda defendants also argue that the continuation of the New York litigation would be particularly wasteful if the case is ultimately dismissed or lost because of a lack of jurisdiction over them. If the Court considered this a serious risk it would weigh heavily in favor of this motion. It is not a serious risk.

**15.** While the defendants argue through their experts that Bermuda law provides for representative actions, they do not dispute the plaintiffs' expert's opinion that representative actions in Bermuda "are approved very infrequently and the courts are much more hostile to representative actions than the U.S. courts are to class actions."

**16.** The proprietary claims are filed by the last investors in the Fund who claim a priority in recovery of the Fund's assets because they rescinded their purchases before they received any shares and before their money was invested. These claims are entirely separate from those in the *Cromer* and *Argos* actions.

New York is presiding over Chapter 11 proceedings against the Fund, and an action by the Fund Trustee against Bear Stearns.

The Second Circuit has recently noted that "[t]he existence of related litigation, while of major significance in § 1404(a) cases, is not listed as a relevant factor in the *forum non conveniens* analysis laid out in *Gilbert,*" *Guidi,* 224 F.3d at 148, and suggested that it may only be relevant where "parties to the American and foreign actions [are] identical and there [is] the likelihood of 'significant duplication of legal efforts on behalf of all the parties.'" *Id.* (citation omitted). Even if this Court were to consider the location of related litigation, it would not tilt the balance toward Bermuda where the litigation there involves only one of the Bermuda defendants and none of the plaintiffs in the *Cromer* and *Argos* actions.[17]

Finally, the defendants argue that any judgment by this Court will need to be enforced in Bermuda through a separate proceeding, but do not contest plaintiffs' evidence that a Bermuda judgment would likely be "obtained in fairly short order at a chambers hearing based on affidavit evidence alone." While the necessity of obtaining a judgment in another country is pertinent, *see Allstate,* 994 F.2d at 1001, it is but one of many factors.[18]

\* \* \* \* \* \*

The Supreme Court has noted that the "ultimate inquiry" in the *forum non conveniens* analysis is "where trial will best serve the convenience of the parties and the ends of justice." *Koster,* 330 U.S. at 527, 67 S.Ct. 828. The ultimate inquiry in this action supports continuation of this litigation in New York. While Bermuda undoubtedly has an interest in this litigation and a trial in New York will cause some strain on the defendants, the defendants' arguments are insufficient to disturb the plaintiffs' choice of forum, even when that choice is given the most minimal level of deference because they are foreign. This is not a case where the plaintiffs have chosen to litigate in New York with one eye on justice and another on harassment of DTB and the Ernst & Young Defendants. *See Gilbert,* 330 U.S. at 507, 67 S.Ct. 839. Because of the strong connection between New York and the underlying facts, and the convenience a New York venue offers to the widely dispersed plaintiffs, it is simply unfair to argue, as the Bermuda defendants do, that the plaintiffs chose this forum to harass and oppress them. Where, as here, the United States and New York in particular also have a significant interest in the issues presented by this litigation; copies of most of the defendants' documents are already in New York; travel between New York and Bermuda is not burdensome; there are more third-party witnesses and relevant documents in New York than in Bermuda; New York is a more convenient forum for the many witnesses and parties who live in neither the United States nor Bermuda; and a New York court has already invested considerable resources in mastering the law and facts relevant to this case while dismissal to Bermuda would necessarily result in delay as a new court began the process anew, dismissal of this action to Bermuda is simply not warranted.

---

**17.** It is undisputed that the proprietary actions are close to being settled.

**18.** DTB mentions in passing that a judgment in New York for the defendants "may" be denied preclusive effect in Bermuda. As DTB chooses to raise this argument only in a footnote, the Court declines to address it here.

364

DTB moves in the alternative to sever the trial of the claims against it from those against Berger and FAM, and to dismiss the claims brought against DTB to Bermuda.[19] It is premature to consider potential prejudice at trial, and in any event, even if severance is found at a later time to be warranted, a dismissal would not be appropriate for the reasons already discussed. Accordingly, DTB's motion to sever the claims against it is denied.

## CONCLUSION

For the reasons discussed above, the motions brought by Deloitte Touche Bermuda, Ernst & Young Bermuda, Fund Administration Services (Bermuda) Ltd., and Kempe & Whittle Associated Limited to dismiss this action on the ground of *forum non conveniens* are denied. The motion brought in the alternative by Deloitte Touche Bermuda to sever the claims against it and dismiss those claims on the ground of *forum non conveniens* is likewise denied.

---

19. To the extent that the Ernst & Young Defendants join DTB's motion for severance, it is likewise denied.